George M. HAMMOND, III, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 6, 1989.
Decided: Dec. 28, 1989.
Rehearing Denied Jan. 18, 1990.

82

Kevin M. Howard (argued), and Mark F. Dunkle, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., and Gary A. Myers, Dept. of Justice, Wilmington, for appellee.

Before MOORE, WALSH and HOLLAND, JJ.

HOLLAND, Justice:

The defendant-appellant, George M. Hammond, III ("Hammond"), was convicted on June 2, 1988, following a jury trial, of two counts of Vehicular Homicide in the First Degree. Hammond was sentenced on August 17, 1988.[1] Hammond filed this appeal on August 18, 1988.[2]

In this appeal, Hammond argues that: (1) the police negligently failed to gather and preserve evidence material to the preparation of his defense; (2) the Superior Court erred in admitting into evidence the results of a blood alcohol test, in the absence of a foundation establishing the reliability of the Du Pont aca Discrete Clinical Analyzer ("Du Pont aca"); and (3) the Superior Court erred in admitting into evidence statements made by Hammond to a police officer.

We have reviewed each of Hammond's contentions. We find no reversible error. Therefore, the judgments of the Superior Court are affirmed.

*Facts*

On July 25, 1986, at about 5:00 A.M., Hammond, then age eighteen, Keith Douglas Moore ("Moore") and Leon Buddy Carter ("Carter"), were involved in a single car accident. They were all occupants in an automobile which left the roadway and came to rest partially imbedded[3] in the foundation of a townhouse that was under construction. The accident resulted in the deaths of Moore and Carter.

Officer William Wayne Walls ("Walls"), of the City of Dover Police Department, was one of the first persons to reach the accident scene. Walls testified as to what he saw when he arrived. Hammond was in the driver's seat of the vehicle, with his left shoulder against the left door, and his right shoulder against the driver's seat. Hammond's right leg, which was in a cast, was entangled between the accelerator and the brake pedal.[4] Moore was also in the front

---

1. With respect to Count One, Hammond was sentenced to Level V supervision by the Department of Correction for two years, the first eighteen months without probation or parole. With respect to count Two, Hammond was sentenced to Level V supervision by the Department of Correction for five years, the first eighteen months without probation or parole, the remainder suspended for three years at Level II. The judge ordered that both sentences be served consecutively and that restitution of $9,282.09 be made to Christiana Hospital.

2. On August 17, 1988, the Superior Court granted Hammond's motion for a certificate of reasonable doubt. 11 *Del.C.* § 4502.

3. The vehicle hit the north side of a townhouse that was being constructed. The left side of the automobile knocked down some of the block foundation. Approximately one-third of the vehicle was underneath the building. The left side of the vehicle and the left front portion of the vehicle had extensive damage. The roof of the vehicle struck the wooden floor joist of the building.

4. One ambulance attendant testified that they had to push the brake pedal over to free Hammond's leg in order to slide it out.

seat area. Moore's head was on Hammond's chest and his feet were in the passenger's foot well. Carter was slumped over in the left rear seat.

Hammond, Moore and Carter were all taken to the Kent General Hospital in Dover. At the hospital, the emergency room physician had questions about the extent of Hammond's injuries. Consequently, he ordered x-rays to be taken and a sample of Hammond's blood to be drawn for tests, including an analysis of its alcohol content. Consistent with the hospital's procedures, a medical technician withdrew the blood and then took it to the hospital's laboratory. The technician testified that he put a serum sample of Hammond's blood, and the reagent kit for alcohol analysis, into the hospital laboratory's Du Pont aca. Hammond's treating physician testified, over Hammond's objection, that the Du Pont aca reported a whole blood alcohol concentration of .13 per cent.

While they were at the hospital, the police discovered that the identification papers found in the possession of one of the crash vehicle's occupants, who had died, did not belong to him. As part of the police efforts to notify the decedent's next-of-kin, Walls went to see Hammond, who was still in the emergency treatment room. After explaining the identification problem, Walls asked Hammond for the names of the people in the car. Hammond told Walls that Moore and Carter were with him. Hammond also told Walls that he had been driving. Later, another Dover officer, Tye Shultz ("Shultz"), talked to Hammond to obtain information in order to complete an accident report.

Prior to trial, Hammond moved to suppress all of his conversations with Walls and Shultz, arguing that they had not been preceded by adequate *Miranda*[5] warnings and waivers. The Superior Court apparently granted the motion with regard to the statements Hammond made to Shultz but refused to exclude the statements made to Walls.[6] As part of its case, the State introduced, over Hammond's objection, the testimony of Walls about his conversation with Hammond at the hospital.

The State also introduced into evidence statements that Hammond had made to two ambulance attendants on the way to the hospital. One attendant asked Hammond if he had been drinking, as a precaution, before treatment was initiated. He testified that Hammond's response was "I had three to four beers, three to four hours prior to the accident." The other ambulance attendant testified that Hammond said the accident occurred when his foot slipped off the brake pedal because of the cast he had on his leg.

Hammond testified in his own defense. His memory had been "hypnotically refreshed."[7] *See generally Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Hammond stated that he graduated from high school on July 24, 1986, after completing summer courses. Following the graduation ceremony, Hammond and several friends celebrated at Scott William Kisters' ("Kisters") apartment. Hammond, Carter, and Moore left Kister's apartment in the early morning hours of July 25, 1986, just prior to the accident. Hammond testified that they had all been drinking and that none of them were in "very good shape." He told the jury that Moore was driving Kister's car at the time of the accident. According to Hammond's

---

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. There is a need for a complete record of all rulings by the trial court in a case of this magnitude. *Cf. Bailey v. State*, Del.Supr., 440 A.2d 997, 1000 n. 1 (1982). Unfortunately, the Superior Court's oral ruling on Hammond's motion to suppress was reported but not transcribed. A Judicial Action Form simply reflects: "7/26/86—statements by Def.—Granted; 7/25/86—interview of Def. Denied."

7. Hammond was hypnotized by a forensic psychologist, at the request of his defense attorney, in an effort to help him recall who had been driving at the time of the accident. The psychologist testified as an expert witness concerning his own qualifications and experience, the nature of hypnosis and his session with Hammond.

testimony, the force of the collision must have moved him and Moore about within the crash vehicle.

In support of his defense, Hammond presented testimony by Dr. George C. Govatos ("Dr. Govatos"), a consulting engineer who was qualified as an accident reconstruction expert. Dr. Govatos testified about the kinematics of occupants in a crash vehicle, who are not wearing seatbelts. Dr. Govatos showed the jury a video tape of a test he had performed. The video tape depicted how the impact of a collision could cause the driver and the passenger to be thrown about and come to rest in each other's original seat. Dr. Govatos testified that an examination of the actual vehicle involved in the collision would have been important to his analysis because of the possibility of evidence in the interior of the vehicle that might have been left by the people as they were moved about by the collision, e.g., hair, blood, pieces of clothing, or other physical evidence.[8] Dr. Govatos testified that the existence of such evidence would have helped him to substantiate his opinion on the movement of Hammond and Moore within the crash vehicle. Dr. Govatos also testified that he would have needed the vehicle in order to determine whether mechanical failure could have caused or partially caused the collision.

The crash vehicle was not available to Dr. Govatos because the Dover police no longer had it in their possession, when Hammond's attorney filed a discovery request on October 14, 1986. Although the crash vehicle had been towed from the scene and impounded, it was released by the Dover City Police on August 8, 1986. No evidence was collected from the vehicle by the City of Dover Police before it was released. Hammond moved for a judgment of acquittal, or for a special instruction to the jury, as a result of the State's failure to preserve or to test the crash vehicle. The Superior Court denied both motions.

### Right of Access to Evidence

The first issue raised by Hammond on appeal is that the failure of the Dover police to preserve the crash vehicle itself or to gather evidence of blood, clothing, tissue, and fingerprints, from inside of the crash vehicle, violated his constitutionally guaranteed right of access to evidence. *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). This Court has recognized that the "obligation to preserve evidence is rooted in the due process provisions of the fourteenth amendment to the United States Constitution and the Delaware Constitution, article I, section 7."[9] *Deberry v. State*, Del.Supr., 457 A.2d 744, 751–52 (1983). The independent and alternative constitutional bases for our holding in *Deberry* is particularly significant in view of the subsequent development of the "access to evidence" doctrine in this Court and the United States Supreme Court. *See Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Bailey v. State*, Del.Supr., 521 A.2d 1069 (1987); *Hughes v. State*, Del.Supr., 490 A.2d 1034 (1985); *Deberry v. State*, 457 A.2d 744 (1983). A review of the evolution of these precedents is not only instructive but necessary for a proper evaluation of Hammond's claim.

In *Deberry*, the question presented was "what relief is appropriate when the State had or should have had the requested evidence, but the evidence does not exist when

---

8. Hammond's first witness, Kisters, testified that on the morning of the collision, after the occupants had been removed from the crash vehicle, he looked inside and saw blood on the steering wheel and on the outside of the driver's door. He also saw blood and hair on the windshield, as well as hair mixed with blood on the steering wheel, and blood scattered throughout the carpet of the vehicle. Kisters further testified that several days later he observed the vehicle, where it was impounded, and its condition remained the same.

9. "The phrase 'due process of law' in the federal Constitution and the phrase 'law of the land', as used in the State Constitution have substantially the same meaning." *Goddard v. State*, Del. Supr., 382 A.2d 238, 240 n. 4 (1977) (citing *Opinion of the Justices*, Del.Supr., 246 A.2d 90 (1968)).

the defense seeks its production?" *Deberry v. State*, 457 A.2d at 749. In answering that inquiry, we held that claims of this type must be examined according to the following paradigm:

1) would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16 or *Brady?*

2) if so, did the government have a duty to preserve the material?

3) if there was a duty to preserve, was the duty breached, and what consequences should flow from a breach?

*Id.* at 750 (citations omitted). The consequences which should flow from a breach of the duty to preserve evidence are determined in accordance with a separate three-part analysis which considers:

1) the degree of negligence or bad faith involved,

2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available,[10] and

3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

*Bailey v. State*, 521 A.2d at 1091 (citing *Deberry v. State*, 457 A.2d at 752).

In *Deberry*, we concluded "[a] claim that *potentially* exculpatory evidence was lost or destroyed by the State can only be decided after each element of the above analysis has been considered." *Deberry v. State*, 457 A.2d at 750 (emphasis added). In *Deberry*, we also noted, for future guidance, the "agencies that create rules for evidence preservation should broadly define discoverable evidence to include any material that *could* be favorable to the defendant." *Id.* at 752 (emphasis added).

The year following our decision in *Deberry*, the United States Supreme Court decided *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). It held:

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 488–89, 104 S.Ct. at 2533–34 (footnote and citation omitted). This Court has examined the "access to evidence" doctrine following *Trombetta*. *See, e.g., Bailey v. State*, Del.Supr., 521 A.2d at 1089–93; *Hughes v. State*, Del.Supr., 490 A.2d at 1049–50. In doing so, we have not limited our inquiry to *Trombetta*'s construction under the United States Constitution. *Id.* Instead, we have held that "[w]hen a defendant claims that the State has failed to preserve evidence, by losing it after it has been gathered, the analysis which a [Delaware] Court must follow is set forth in *Deberry*." *Bailey v. State*, 521 A.2d at 1090; Del. Const. art I, § 7.

Following our decision in *Bailey*, the United States Supreme Court decided *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). It held:

The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated defendant.... We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence

---

**10.** *The* consideration of secondary or substitute evidence was added by this Court in *Bailey v.*

*State*, Del.Supr., 521 A.2d 1069, 1091 (1987).

does not constitute a denial of due process of law.

*Id.* 109 S.Ct. at 337.

It appears that, as a matter of federal Constitutional law, the United States Supreme Court has developed a *hybrid approach* when a claim of denial of access to evidence is asserted. The principles of *Trombetta* are applicable to claims relating to a denial of access to *Brady* types of evidence. *Id.* The "good faith" principles of *Youngblood* are applicable to allegations of a denial of access to potentially favorable types of evidence. *Id.* However, in *Deberry,* in the event that *either* claim was made, this Court adopted a *unitary* approach. *Deberry v. State,* 457 A.2d at 750.

In Hammond's case, the State has asked this Court to reconsider its decision in *Deberry,* in view of the holding in *Youngblood.*[11] In *Deberry,* the conduct of the State was only one of three factors to be considered when potentially exculpatory evidence had not been preserved. *Id.* The State argues that *Youngblood* has now established a *single* bright line "good faith" test which should be applied by this Court in lieu of the *Deberry three-part analysis,* whenever a denial of access is asserted with respect to evidence that *could* be favorable to the defendant.

■ We remain convinced that fundamental fairness, as an element of due process, requires the State's failure to preserve evidence that could be favorable to the defendant "[to] be evaluated in the context of the entire record." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976); *Deberry v. State,* 457 A.2d at 752; Del. Const. art. I, § 7. When evidence has not been preserved, the conduct of the State's agents is a relevant consideration, but it is not determinative. Equally relevant is a considera-

tion of the importance of the missing evidence, the availability of secondary evidence, and the sufficiency of the other evidence presented at trial. *Bailey v. State,* 521 A.2d at 1091; *Deberry v. State,* 457 A.2d at 752. "[T]here may well be cases which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Arizona v. Youngblood,* 109 S.Ct. at 339 (Stevens, J., concurring).

■ "Rules concerning [the] preservation of evidence are generally matters of state, not federal constitutional law." *California v. Trombetta,* 467 U.S. at 491, 104 S.Ct. at 2535 (O'Conner, J., concurring). We reaffirm our prior holdings, pursuant to the "due process" requirements of the Delaware Constitution. Del. Const. art. I, § 7; *Bailey v. State,* 521 A.2d at 1089–93; *Deberry v. State,* 457 A.2d at 744–54. When the State has failed to preserve evidence that *could* be favorable to the defendant, the analysis which a court must follow is set forth in *Deberry* and *Bailey.* That analysis draws a balance between the nature of the State's conduct and the degree of prejudice to the accused.[12] *Id.* In general terms,[13] if the duty to preserve evidence has been breached, a Delaware court must consider "1) the degree of negligence or bad faith involved[14]; 2) the importance of the missing evidence, considering the probative value and reliability of secondary or substitute evidence that remains available; and 3) the sufficiency of the other evidence used at trial to sustain conviction." *Bailey v. State,* 521 A.2d at 1091 (citing *Deberry v. State,* 457 A.2d at 752); Del. Const. art. I, § 7. We will examine Hammond's contentions in accordance with these principles.

---

**11.** In both *Deberry* and *Youngblood,* the evidence that had not been preserved was clothing in a charge of sexual assault.

**12.** "The State must justify the conduct of the police or prosecutor, and the defendant must show how his defense was impaired by the loss of the evidence." *Deberry v. State,* 457 A.2d at 752.

**13.** The more specific considerations which must be made are set forth in *Deberry,* 457 A.2d at 752–53.

**14.** If the missing evidence is *Brady* material, the conduct of the State agent is irrelevant. The second two factors in the analysis alone are determinative.

The first step in a *Deberry* evaluation is to determine whether the crash vehicle, if extant in the possession of the State, would have been subject to disclosure under Superior Court Criminal Rule 16 or *Brady? Deberry v. State,* 457 A.2d at 750. As we noted in *Deberry,* determining whether the crash vehicle would have been discoverable under *Brady* would be an artificial exercise, since it is no longer available for examination or testing. *Id.* at 751 n. 5. Therefore, we begin with the provisions of Rule 16.

■ "[U]nder Superior Court Criminal Rule 16(b), a defendant need only show that an item 'may be material to the preparation of his defense' to be discoverable." *Deberry v. State,* 457 A.2d at 752 (citations omitted).[15] This Court has held in another homicide case, that the car which the defendants were using, when the victim was shot and killed, was clearly material to the defense and discoverable under Rule 16. *See Winsett v. State,* Del.Super., 200 A.2d 237 (1964). *A fortiori,* the crash vehicle may clearly be material to the preparation of the defense of a person, such as Hammond, charged with vehicular homicide. Therefore, if the crash vehicle were in the possession of the State, it would have been discoverable under Superior Court Criminal Rule 16.

■ The second step in a *Deberry* evaluation requires an examination of the State's duty to preserve discoverable evidence. This Court has declined to prescribe the exact procedures that are necessary for the various law enforcement agencies in this State to follow, in order to fulfill their duties to preserve evidence. *Deberry v. State,* 457 A.2d at 752. However, this Court has held that in fulfilling these duties, agencies should create rules for gathering and preserving evidence that are broad enough to include any material

that could be favorable to a defendant. *Id.* In *Deberry,* we observed:

"It is most consistent with the purposes of those safeguards to hold that the duty of disclosure attaches in some form once the Government has first gathered and taken possession of the evidence in question. Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence.... *Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later.*"

*Deberry v. State,* 457 A.2d at 751 (quoting *United States v. Bryant,* 439 F.2d 642, 651 (D.C.Cir.1971)) (emphasis added). We find that the police had a duty to gather and to preserve a crash vehicle which they knew was involved in a fatal accident, when criminal charges were pending and a criminal investigation was continuing.

■ The record reflects that the crash vehicle was "gathered." It was towed from the scene of the crime and impounded, at the direction of the Dover Police Department, on July 25, 1986.[16] However, the crash vehicle was not preserved. It was released on August 8, 1986. Although Hammond was arrested shortly after the accident, he was not indicted until September 3, 1986. Consequently, when Hammond's attorney filed a discovery request on October 14, 1986, pursuant to criminal Rule 16, the Dover police no longer had possession of the crash vehicle.[17] The record reflects that the duty to preserve the crash vehicle, at least until the defendant had a reasonable opportunity to inspect it, was breached in Hammond's case.

The final step in a *Deberry* evaluation requires a three-part analysis to determine the consequences which should flow from a breach of the duty to preserve evidence.

**15.** In *Deberry v. State,* this Court held that the clothes seized at the time of the defendant's arrest were material to the defendant, who was charged with sexual assault, and discoverable under Rule 16. 457 A.2d at 751.

**16.** Kister, who was not involved with law enforcement, testified that he had to "sign" to see

the impounded vehicle, while it was stored at a private company.

**17.** Hammond's request for discovery and inspection pursuant to Superior Court Criminal Rule 16 included a request for "all items of physical evidence recovered at the scene of the alleged crime."

The first factor to be considered is "the degree of negligence or bad faith involved." *Bailey v. State*, 521 A.2d at 1091 (citing *Deberry v. State*, 457 A.2d at 752). Hammond does not contend that the Dover police department released the crash vehicle in bad faith. Hammond does argue that the police were negligent.

The State argues that the police were not negligent in releasing the crash vehicle. When the police arrived, they found the bodies of the accident victims inside of the crash vehicle, in positions which indicated Hammond was the driver. At the hospital, Hammond told one of the investigating police officers that he was the driver. Under these conditions, the State argues that the police had no basis to believe that Hammond would deny being the driver [18] or that the crash vehicle could be material to the preparation of his defense.

■ The State's argument is addressed to the good faith of the Dover police in releasing the crash vehicle. However, Hammond does not argue that the Dover police acted in bad faith. Hammond's position is that the police were negligent in not preserving the crash vehicle when he was charged with vehicular homicide, since the crash vehicle was the instrumentality of that crime. The Superior Court expressed concern "why a major piece of evidence [the crash vehicle] would not be held at least a little bit longer to give the defendant a chance to look at it." We conclude that the Dover police should have preserved the crash vehicle, for a reasonable time, to permit its inspection by Hammond.[19]

The second factor to be considered in this portion of a *Deberry/Bailey* evaluation is the importance of the missing evidence and the reliability of the secondary or substitute evidence that remains available. *Bailey v. State*, 521 A.2d at 1091. Hammond argues that the crash vehicle was important to his case for two separate reasons. First, because evidence of fingerprints, blood, hair, or torn clothing in the interior of the crash vehicle might have established that he was not the driver. Alternatively, because the crash vehicle could have been examined for mechanical failure as a cause of the accident, rather than driver negligence.

The secondary evidence which the State provided to Hammond consisted of primarily photographs of the crash vehicle.[20] The maintenance records of the crash vehicle's owner were also available. Hammond contends that the secondary evidence, especially as it related to his ability to identify the driver, was not a satisfactory substitute. Hammond admits that his expert was able to prepare a video tape of a test, which supported his theory of the hypothetical movement of Hammond and Moore in the vehicle upon impact. However, Hammond argues that without either access to scientific test results or the opportunity to test the interior of the crash vehicle, he was unable to confirm his expert's opinion.

■ The police found no evidentiary value in the crash vehicle or its contents. In this case, once again, we decline to establish specific procedures which are necessary for law enforcement agencies in this State to fulfill the duty to gather and to preserve evidence. *Deberry v. State*, 457 A.2d at 752. Nevertheless, assuming *arguendo* that there was no duty to gather and test evidence of the interior of the

---

18. In the Superior Court and in this appeal, Hammond argued that the Dover police had knowledge of his defense that he was not driving, based upon the *second* statement he made to the police. In the second statement, Hammond said, "I don't know if I was driving the car, but if I was driving the car there was a car that pulled out in front of me while I was making the turn." This statement was not before the jury because Hammond's pretrial motion to suppress it had been granted.

19. The crash vehicle belonged to a third party, who had interest in regaining its control. However, once the vehicle became the instrumentality of a crime, those proprietary rights become subordinate to Hammond's due process rights for a reasonable period of time.

20. The record reveals that the police took eighty-five photographs. However, only one photograph was of the front interior of the car.

crash vehicle,[21] the crash vehicle in a vehicular homicide should have been preserved. If the crash vehicle itself had been preserved, it would have been available to Hammond for testing. There was little, if any, probative value in the secondary evidence of the crash vehicle's interior that was made available to Hammond, i.e., a single photograph.

The final factor in determining what consequences should flow from the State's breach of the duty to preserve evidence in a *Deberry* evaluation, requires an examination of the sufficiency of the other evidence, which the State presented at trial. In Hammond's case, the State presented eyewitness testimony from another driver, who saw the crash vehicle pass him at a high rate of speed immediately prior to the collision. The record also reflects that the crash vehicle did not turn over and that all of its occupants remained inside. The crash vehicle became lodged in the foundation of a townhouse. Several persons reached the scene of the accident, almost immediately after it occurred. All of them testified that they saw Hammond in the driver's seat. Rescue workers testified that Hammond's leg was in a cast, which was wedged between the accelerator and the brake. The ambulance attendant testified that Hammond told him that he was driving, and that the accident occurred when the cast on his leg caused his foot to slip off of the brake pedal.

The question which must now be answered is what consequences should flow from the failure to preserve the crash vehicle. In the Superior Court, Hammond moved for dismissal or an instruction to the jury that the lost evidence, if available would be exculpatory in nature. *See Deberry v. State*, 457 A.2d at 754. In ruling on Hammond's motions, the Superior Court stated it is "clear that the occupants were moved around in the car after the collision." Nevertheless, the Superior Court denied both of Hammond's motions because he had not shown that the evidence, which was not available, would have been *conclusively exculpatory* to the defendant.

■ The "conclusively exculpatory" standard, which was applied by the Superior Court, is obviously inconsistent with our holding in *Deberry*. Nevertheless, we find that the State's case against Hammond was strong. Hammond's trial for vehicular homicide, even in the absence of the crash vehicle, was not so fundamentally unfair that his prosecution should have been barred as a denial of due process. Del. Const. art I, § 7. The Superior Court properly denied Hammond's motion to dismiss the State's case.

■ However, since the State must bear responsibility for the loss of evidence, Hammond was entitled to the inference that the crash vehicle, if available, would have been exculpatory. *Deberry v. State*, 457 A.2d at 754. "Due process" required an appropriate instruction to the jury in a prosecution for vehicular homicide, in the absence of the preservation of the crash vehicle or of secondary evidence having a significant probative value. *Deberry v. State*, 457 A.2d at 754; Del. Const. art. I, § 7. Such an instruction was given in *Arizona v. Youngblood,* even though no federal Constitutional right was found to have been violated.[22] 488 U.S. 51, 109 S.Ct. 333, 335, 102 L.Ed.2d 281 (1988).

---

21. The extent of the duty to gather and test evidence in any case will vary with the circumstances. The occupants were thrown from the automobile in *State v. House,* 481 A.2d 1129 (Me.1984).

The evidence obtained from the interior of the car included the following: torn pieces of clothing found in the car; pieces of car seat fabric; the brake and clutch pads; the steering wheel; test results from blood stains found in the car; test results from arm and head hairs found in the car; and numerous photographs taken from various angles at the scene and at the autobody shop.

*Id.* at 1132 n. 1.

22. In his concurring opinion, Justice Stevens attached particular significance to the fact that such an instruction had been given.

More significantly, the trial judge instructed the jury: 'If you find that the State has … allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest.' As a result, the uncertainty as to what the evidence might have proved was turned to the defendant's advantage.

We must now determine the effect of the Superior Court's failure to give such an instruction. Hammond's expert witness was able to prepare a video tape of a test supporting Hammond's theory of the hypothetical movement of the crash vehicle's occupants. Although Hammond's request for a jury instruction was denied, the Superior Court permitted Hammond's attorney to make "factual arguments," about the absence of the crash vehicle or any tests of its interior, to the jury and he did so forcefully. Given the strength of the State's case against Hammond, we are convinced beyond a reasonable doubt, that the Superior Court's failure to give a specific instruction was harmless error. *Michael v. State,* Del.Supr., 529 A.2d 752, 761 (1987); Del. Const. art I, § 7.

### Hospital Laboratory Results

Hammond's next contention is that the Superior Court erred in admitting the Du Pont aca results of his blood alcohol test into evidence. The record reflects that the hospital used the Du Pont aca to analyze the blood of all patients. An alcohol analysis is only one of many blood tests that the Du Pont aca can perform.

Hammond's treating physician testified that he ordered the blood alcohol test for medical reasons.[23] He testified that he and other physicians routinely relied on the Du Pont aca results for their treatment decisions in the hospital. The technician who withdrew Hammond's blood sample and operated the Du Pont aca also testified. The technician stated that he had performed the same procedure at the hospital with respect to the blood of thousands of patients. However, both the technician, and Hammond's treating physician stated that they were unfamiliar with the internal operation of the Du Pont aca.

Hammond argues that the State did not lay a sufficient foundation to support the reliability of the Du Pont aca. He contends that the prosecution's foundation was defective because it did not include explicit testimony establishing the nature and validity of the scientific principles incorporated in the Du Pont aca. The Superior Court disagreed. The Superior Court found that the Du Pont aca blood analyzer was a hospital instrument used for therapeutic purposes and relied upon by physicians for the treatment of patients. The Superior Court held that these facts constituted sufficient evidence of reliability to establish a foundation for admitting the test results of the Du Pont aca into evidence.

The proponent of any evidence always has the burden of establishing its admissibility. There is no single method "for judging the admissibility of expert testimony concerning scientific test results in Delaware." *Santiago v. State,* Del.Supr., 510 A.2d 488, 489 (1986) (citations omitted). In *Santiago,* over the defendant's objection, the State introduced the results of a blood alcohol test performed by the State Chemist, using the Beckman gas chronograph and the Fisher strip chart record. *Id.* This Court held, as the Superior Court noted, that "when a qualified expert testifies, he need only show that any test used as a basis for his opinion is reasonably relied upon by experts in his field." *Id.* The testimony of Hammond's treating physician, concerning the use of the Du Pont aca for the analysis of hospital patients' blood, met that standard. *Id.* The evidence presented by the State in Hammond's case demonstrated that the Du Pont aca was routinely used by the hospital, and that its results were regularly relied upon by physicians in the course of making decisions for medical treatment.

*Arizona v. Youngblood,* 109 S.Ct. at 338 (Stevens, J., concurring).

**23.** Q. To the best of your recollection, Doctor, what was the purpose of your ordering this blood alcohol test in this case?

A. Again, I was surprised that, and happy that, he wasn't hurt worse than he was with what had happened to the other fellows in the accident and I wanted to be sure that I was not missing something or try to be sure I was not missing something.

Q. Doctor, does the record indicate at what time you ordered a blood alcohol test?

A. Well, it looks like 6:30, 0630; same time I ordered the other tests it looks like.

In *McLean v. State*, Del.Supr., 482 A.2d 101, 104 (1984), the defendant was also charged with vehicular homicide. He, like Hammond, objected to the admission of hospital records containing the results of blood and alcohol analysis performed by the medical facility. Even though *there was no expert testimony* explaining the validity and accuracy of the technique used by the hospital to make the measurement, this Court found that the reported results had "sufficient indicia of reliability" to allow their admission. *Id.* This Court concluded that the business of a hospital is such that the records relied upon by the doctors in making diagnostic decisions made the results "trustworthy" and indeed "creat[ed] a presumption of reliability." *Id.* at 104–05.

Hammond's argument is contrary to our holdings in both *McLean* and *Santiago*. We find that the Superior Court properly admitted the results of the Du Pont aca's analysis of Hammond's blood into evidence.

### Hammond's Hospital Statement

■ Finally, Hammond contends that the Superior Court erred by allowing Walls to testify as to the statements made to him by Hammond. Hammond argues that since he was not given the *Miranda* warnings, his statements to Walls were taken in violation of his right against self-incrimination guaranteed by the fifth amendment to the United States Constitution and by article I, section 7 of the Delaware Constitution. Alternatively, Hammond argues that the statements he made to Walls were given while Walls was investigating the acci-

dent in order to prepare a report, and are privileged from disclosure in any civil or criminal trial arising out of the accident. 21 *Del.C.* § 4203.[24] The record does not reflect that Hammond's alternative argument was presented to the Superior Court. Therefore, we will not consider it on appeal. Supr.Ct. R. 8.

■ Walls' testified that, although he was one of the first Dover police officers to arrive at the accident scene, he was not in charge of the investigation. He testified that it was normal police procedure to take accident victims who have been injured to the hospital immediately and to find out their identity later. Walls testified that in Hammond's case, he was asked to go to the hospital to ascertain those identities. When he arrived, Walls was advised by the hospital personnel that the crash vehicle's occupants were Hammond, Carter, and Daniel Pearson, who was dead upon arrival. Walls telephoned this information to his headquarters, so that the accident victims' relatives could be notified.

Almost immediately after Walls had completed conveying the victims' identities, another police officer arrived at the hospital and asked Walls who had been injured. Walls told him the names and that Daniel Pearson was deceased. The officer, who knew Pearson, went to see his body and informed Walls the decedent was not Daniel Pearson. Walls promptly telephoned headquarters again and requested that no relatives be notified of the accident until the identification problem had been resolved.

**24.** That statute provides:
    (a) The driver of any vehicle involved in an accident resulting in injury or death to any person or property damage to an apparent extent of $250 or more shall immediately, after complying with the requirements of §§ 4201 and 4202 of this title, report such accident to the nearest state police station, except that when such accident occurs within the City of Wilmington such report shall be made to the Department of Public Safety in that City.
    (b) The Department of Public Safety may require drivers involved in accidents, or police departments, to file supplemental reports of

accidents upon forms furnished by it whenever the original report is insufficient in the opinion of the Department of Public Safety. Such reports shall be without prejudice, shall be for the information of the Department of Public Safety and shall not be open to public inspection. The fact that such reports have been so made shall be admissible in evidence solely to prove a compliance with this section but *no report or any part thereof or statement contained therein shall be admissible in evidence for any other purpose in any trial, civil or criminal, arising out of such accidents.*
21 *Del.C.* § 4203 (emphasis added).

Walls testified that he then went to Hammond, who was still in the emergency room:

Q. What did you do after you approached the defendant and asked him how he was doing?

A. He told me his back was sore and I believe, and I don't recall this one hundred percent, but I believe he asked me how his friends were. I don't recall for sure, but then I explained to him we had an identification problem and I wanted to know where Daniel Pearson was seated in the car.

He told me he didn't know any Daniel Pearson and there was no Daniel Pearson in the car.... So I asked him who was in the car and where they were seated.

Q. How did you go about doing that?

A. Well, I told him we had this identification problem and I asked him who was the passenger in the backseat and he told me Buddy Carter and I said well, who was in the right front seat and he told me it was Mr. Moore, Dougie Moore and I asked him well, you were driving. He said yes, he was driving and I said well, who was Daniel Pearson, where was he. He said I don't know anything about a Daniel Pearson, there was no Daniel Pearson in the car, just the three of them.

After speaking with Hammond, Walls called his headquarters with the correct identifications. During that telephone call, Walls did not mention that Hammond had been the driver.

Walls testified that Hammond was not advised of his *Miranda* rights before he asked him about the identity of the crash vehicle's occupants. Walls also testified that Hammond was not in custody in the emergency room and would have been free to decline to talk to him and to leave the hospital, when his medical treatment was

concluded. Walls testified that when he spoke to Hammond in the emergency room, he was not investigating the accident. He stated that he was only trying to find the identity of the crash vehicle's occupants so that their relatives could be contacted.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held:

[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Id.* at 444, 86 S.Ct. at 1612 (footnote omitted). The *Miranda* procedural safeguards were expressly limited to interrogation in a custodial setting. *Id.* at 478–79, 86 S.Ct. at 1629–30. The concept of "custodial interrogation" is not limited to an interview at a police station or after formal arrest. *See, e.g., Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); *Conyers v. State*, Del.Supr., 396 A.2d 157, 159 (1978). Various courts have considered whether an individual at a hospital is in "custody" for *Miranda* purposes.[25] A review of those cases reveals that there is no

---

**25.** *See, e.g., State v. Tucker,* 131 N.H. 526, 557 A.2d 270, 272–73 (1989) (collecting cases) and Annotation, *What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Re-* quiring *That Suspect Be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* 31 A.L.R.3d 565, 620–25 (1970).

"hospital rule" per se. In each case, the conclusion concerning the custodial nature of the interrogation depended upon the facts which were presented.

The record in Hammond's case reveals that Hammond was in the emergency room area of the hospital as a result of his medical condition only and not because of any police action. The record does not contain any evidence that Hammond could reasonably believe his freedom of action or movement was restricted during his conversation with Walls. There was a legitimate need to identify the occupants of the crash vehicle. Hammond was the only person who was capable of identifying his travelling companions. Walls' questions were brief and concluded after the identities of Hammond's companions had been established.

This Court has previously concluded that the rules established in *Miranda* do not apply to "the routine, initial, on-scene investigation by the police." *Laury v. State*, Del.Supr., 260 A.2d 907, 908 (1969). In this case, the police were unable to obtain identification of the crash vehicle's occupants at the scene, because they had been removed by ambulance. *Compare People v. Milhollin*, 751 P.2d 43, 51 (Colo.1988). Given the facts of this case, we find that Walls' limited questioning of Hammond at the hospital was not a custodial interrogation and that Walls was not required to advise Hammond of his *Miranda* rights.[26] We affirm the Superior Court's ruling that the absence of *Miranda* warnings did not render Hammond's statements to Walls inadmissible. U.S. Const. amend. V; Del. Const. art. I, § 7.

*Conclusion*

The judgments of the Superior Court, resulting in Hammond's convictions, are AFFIRMED.

## ON MOTION FOR REHEARING EN BANC

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ. (constituting the Court en banc).

This 18th day of January, 1990, the Court has before it the State's motion for rehearing *en banc*. In its motion, the State requests that this Court reconsider its opinion. The State argues that the Court *en banc* should overrule the construction of the Delaware Constitution set forth in *Deberry v. State*, Del.Supr., 457 A.2d 744 (1983), in view of the United States Supreme Court's decision in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

For the reasons stated in the panel opinion in this case, the Court *en banc* has concluded that *Deberry* articulates the proper construction of the Delaware Constitution. The State's motion for rehearing *en banc* is DENIED.

**26.** *Accord People v. Milhollin*, 751 P.2d 43 (Colo. 1988); *State v. Sandoval*, 92 Idaho 853, 452 P.2d 350 (1969); *State v. Brunner*, 211 Kan. 596, 507 P.2d 233 (1973); *People v. Clark*, 55 Ill.App.3d 496, 13 Ill.Dec. 338, 371 N.E.2d 33 (1977); *Cummings v. State*, 27 Md.App. 361, 341 A.2d 294 (1975); *State v. Lapp*, 202 Mont. 327, 658 P.2d 400 (1983); *People v. Gilbert*, 8 Mich.App. 393, 154 N.W.2d 800 (1967); *State v. Zucconi*, 50 N.J. 361, 235 A.2d 193 (1967); *People v. Phinney*, 22 N.Y.2d 288, 239 N.Y.S.2d 632, 239 N.E.2d 515 (1968); *State v. Fields*, 294 N.W.2d 404 (N.D. 1980); *State v. Sadler*, 85 Or.App. 134, 735 P.2d 1267, *modified on reconsideration*, 86 Or.App. 152, 738 P.2d 601 (1987); *Commonwealth v. Fento*, 363 Pa.Super. 488, 526 A.2d 784 (1987); *State v. Clappes*, 177 Wis.2d 277, 344 N.W.2d 141 (1984). *Compare Vandegriff v. State*, 219 Tenn. 302, 409 S.W.2d 370 (1966); *Clemmer v. State*, 645 S.W.2d 918 (Tex.Ct.App.1983); *Commonwealth v. Fisher*, 466 Pa. 216, 352 A.2d 26 (1976); *Scales v. State*, 64 Wis.2d 485, 219 N.W.2d 286 (1974).