Darnell HARRIS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 178, 1996.

Supreme Court of Delaware.

Submitted: April 1, 1997.
Decided: June 2, 1997.

Jerome M. Capone, Wilmington, for Appellant.

Steven P. Wood and John Williams (argued), Deputy Attorneys General, Department of Justice, Dover, for Appellee.

Before VEASEY, C.J., WALSH and BERGER, JJ.

VEASEY, Chief Justice:

In this appeal we affirm judgments of the Superior Court entered upon jury verdicts convicting the defendant, Darnell Harris, of second degree murder and a number of other criminal offenses arising out of an alleged gang-related killing. The issues on appeal primarily surround the exercise of the discretion of the trial judge in several aspects of the conduct of the trial, including some rather unusual developments.

Harris contends that the Superior Court committed reversible error in: (1) admitting ballistics evidence of the alleged homicide weapon that had been corroded from being in pond water; (2) instructing the jury on accomplice liability; (3) refusing to expand the scope of defendant's cross-examination of a prosecution witness who requested to speak with the prosecutor during cross; (4) overruling Harris' hearsay objections to statements made during an alleged conspiracy; and (5) excluding impeachment evidence of prior convictions of certain State witnesses. We have concluded that no error of law and no abuse of discretion have been shown. Therefore, we affirm the judgments of the Superior Court.

### Facts

Harris was convicted, following a jury trial, of murder second degree (11 *Del.C.* § 635), conspiracy first degree (11 *Del.C.* § 513), conspiracy second degree (11 *Del.C.* § 512), riot (11 *Del.C.* § 1302), reckless endangering first degree (11 *Del.C.* § 604), and three counts of possession of a firearm during the commission of a felony (11 *Del.C.* § 1447A).

The convictions arise out of the following facts. In the early morning of June 25, 1994, Quincy Johnson, a well-known resident of the Southbridge section of Wilmington, was shot and severely wounded. As word of the shooting spread, a crowd of approximately forty men, including Harris, gathered in the courtyard of the Southbridge housing project. A group of twenty-two men decided to

collect guns and ammunition and drive in a caravan to Wilmington's west side to hurt Corey "Skeebo" Pinkney, a resident of the Hilltop section of Wilmington's west side, whom they suspected in the shooting. Several people, including Harris, brought weapons. Harris was also seen carrying a box of bullets.

The lead car in the caravan was a Ford Vista minivan driven by Jonathan Brodie. Harris was in the front passenger seat. In the seat behind him was Oliver Cephas. Also in the back seat were Kenny Davis and Antonio Carter. There was talk in Brodie's van about shooting "Skeebo."

Brodie testified that, upon reaching the west side of Wilmington, Cephas, who was armed with a .22 caliber pistol, began shooting for no apparent reason at a group of men who were sitting on the steps of a building at the intersection of Third and Delamore Streets. One was struck in the foot. When the shooting began, Eric Glasco and his friend Segiaray Lane were approximately one and one-half blocks away, riding bicycles down Third Street, away from Delamore Street and toward Broom Street. Glasco and Lane heard the gun shots and saw several cars turning onto Third Street from Delamore Street. Brodie's Ford Vista caught up with Glasco and Lane, and then pulled abreast of them, approximately eight feet away.

Brodie and Carter both testified that Harris fired at Glasco and that his weapon was a black Lorcin .38 caliber semi-automatic pistol. Glasco was killed by a single .38 caliber bullet, which struck him in the head. Brodie, Carter, and Marvin Harrigan later identified as the murder weapon the .38 caliber handgun that the State introduced into evidence. Lane and a bystander, Jackie Kinard, also testified that the fatal shot was fired by someone riding in Brodie's van.

After the shooting, the caravan returned to Southbridge—having never located "Skeebo." Harris was overheard saying that he "bucked [shot] the nigger." Harrigan testified that the next day he had a conversation with Cephas and Harris in which one of them said,

"We got that boy." Cephas hid the handguns temporarily. Several days later, Harrigan threw the handguns into a pond.

When Brodie's van was found and searched by the police, a .38 caliber shell casing of the same make and manufacturer as the bullet that killed Glasco was found lodged over the passenger side window. After his arrest, Harrigan revealed the location of the guns to the Wilmington Police, who recovered the guns on August 15, 1994. The guns were immediately stored in cans filled with pond water in order to prevent the weapons from rusting upon their exposure to air and to preserve any existing latent fingerprints. The guns were then sent to the F.B.I. crime lab for latent fingerprint analyses and firearms identification processing.

The F.B.I.'s latent fingerprint analyst received the gun in question on September 28, 1994, and returned the weapon as she had received it to the F.B.I.'s expert firearms examiner, Special Agent Gerald Wilkes, on October 6, 1994. When the F.B.I. was finished with its analysis, the .38 caliber handgun was placed, inexplicably, in the same pond water-filled can, where it remained until June 26, 1995, when it was examined by Harris' ballistics expert, William Welch. Due to the corroded condition of the gun, Welch was unable to perform any ballistics testing. Welch testified that, had he received the gun the day after it was tested by Wilkes, he "might" have been able to exclude that gun as the one that fired the deadly bullet.

### The Ballistics Evidence

■ Harris filed a pre-trial motion in limine asking the Superior Court to exclude the ballistics evidence of Agent Wilkes. The Superior Court ruled that the FBI ballistics evidence was admissible, but found that Harris was entitled to a jury instruction based on the State's failure to preserve the evidence properly. That jury instruction (the *Lolly* instruction) [1] accorded Harris a favorable inference based on the missing evidence. On appeal, Harris contends that the Superior Court erred in admitting the ballistics evi-

---

1. *Lolly v. State*, Del.Supr., 611 A.2d 956, 962 n. 6 (1992).

dence because the State was negligent in preserving the .38 caliber handgun. He further argues that the *Lolly* instruction was ineffective because the State was allowed to argue to the jury, "You decide for yourself what it means once the judge tells you that the accidental markings did not match."

■ In *Deberry v. State*, this Court articulated a three-part test to be applied when a defendant asserts that the State has lost or failed to preserve potentially exculpatory evidence:

1) Would the requested material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure?

2) Was the government duty bound to preserve the material?

3) And, if there was a duty to preserve and the duty was breached, what consequences should flow from the breach.[2]

This Court evaluates claims with respect to evidence lost or not preserved in the context of the entire record of a given case.[3]

■ The State argues that it was never in possession of the material evidence, which it argues are the accidental or individual markings that were once on the barrel of the .38 caliber handgun. The State contends that, since the gun had been submerged in the pond for approximately forty-five days before being recovered by the police, the process of corrosion had already begun so that neither the State nor Harris could match the fatal bullet to the accidental or individual markings on the weapon's barrel.

We reject the State's argument. In *Deberry v. State*, the potentially exculpatory evidence was Deberry's clothing itself, not the aspects of the material that the defendant intended to have scientifically tested.[4] Similarly, in the case sub judice, the Superior Court properly determined that the material

evidence that the State failed to preserve was the .38 caliber handgun, not the accidental or individual markings that were once on the barrel of the .38 caliber handgun.

■ The State does not challenge the Superior Court's findings that the .38 caliber handgun was subject to disclosure and that the State had a duty to preserve the gun, which duty the State breached when the State failed to air dry the gun after the fingerprint analysis. The consequences that should flow from a breach of the duty to preserve evidence are determined in accordance with a separate three-part analysis, which considers:

1) the degree of negligence or bad faith involved;

2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and

3) the sufficiency of the other evidence produced at trial to sustain the conviction.[5]

In applying these factors in the context of a timely raised objection, a trial court must weigh the nature of the State's conduct against the degree of prejudice to the accused.[6]

As to the first factor, the Superior Court properly determined that the State's failure to air dry the gun following the fingerprint analysis was negligent. There is no evidence of bad faith on behalf of the State. The Superior Court further determined that the negligently preserved evidence was "critical and central" under the State's theory that Harris himself shot Glasco, though not as critical to the State's alternate theory of accomplice liability.

The record indicates that the importance of accidental markings is questionable. Welch testified that, had he received the gun

---

**2.** *Deberry v. State,* Del.Supr., 457 A.2d 744, 750 (1983); *see also Hammond v. State,* Del.Supr., 569 A.2d 81, 86 (1989); *Bailey v. State,* Del. Supr., 521 A.2d 1069, 1090–91 (1987).

**3.** *Hammond,* 569 A.2d at 87.

**4.** *Deberry,* 457 A.2d at 751; *see also Hammond,* 569 A.2d at 88–89 (material evidence was entire

crash vehicle, not the specific parts of the car necessary to determine, inter alia, whether mechanical failure could have caused crash).

**5.** *Bailey,* 521 A.2d at 1090–91.

**6.** *Deberry,* 457 A.2d at 752.

the day after it was tested by Wilkes, he "might" have been able to exclude that gun as the one that fired the deadly bullet. The record further indicates that, whereas a match between the accidental markings on the bullet and in the barrel would have proven inculpatory, a mismatch would not necessarily have proven exculpatory. Moreover, the State's ballistics tests revealed that the gun was not producing consistent marks between bullet and barrel. The ballistics experts for the prosecution and the defense agreed that, if a specific gun does not reproduce consistent bullet markings, inconsistent markings do not eliminate the possibility that a certain bullet came from a certain gun. The Superior Court fairly resolved any doubt regarding the significance of the missing markings by giving a *Lolly* instruction.

Finally, we agree with the Superior Court that there was sufficient other evidence produced at trial to sustain the conviction. Two of Harris' co-conspirators, Jonathan Brodie and Antonio Carter, testified that Harris fired at Glasco, and that his weapon was a black Lorcin .38 semi-automatic pistol. Brodie, Carter, and Marvin Harrigan later identified as the murder weapon the .38 caliber handgun introduced into evidence by the State. Lane and bystander Jackie Kinard also testified that the fatal shot was fired by someone riding in Brodie's van. Brodie testified that only two of the occupants of his van, Harris and Oliver Cephas, fired guns during the course of the crime and that Cephas was armed with a .22 caliber pistol. Glasco was killed by a single .38 caliber bullet, which struck him in the head.

■ In *Lolly v. State*, we held that "[o]nce it has been established [by the court] that the State must bear responsibility for the loss of material evidence, an appropriate jury instruction is required as a matter of due process under the Delaware Constitution."[7] In this case, the trial judge instructed the jury as follows:

In this case, ladies and gentlemen, the Court has determined that the State failed to preserve individual or accidental microscopic characteristics once found in the barrel of the Lorcin .38 semiautomatic pistol which were material to the defense. The failure of the State to preserve such evidence entitles the defendant to an inference that if such evidence were available at trial, it would be exculpatory. This means that, for purposes of deciding this case, you are to assume that the missing evidence, had it been preserved, would not have incriminated the defendant and would have tended to prove the defendant not guilty. The inference does not necessarily establish the defendant's innocence, however. If there is other evidence presented which establishes the fact or resolves the issue to which the missing evidence was material, you must weigh that evidence along with the inference. Nevertheless, despite the inference concerning the missing evidence, if you conclude, after examining all the evidence, that the State has proven beyond a reasonable doubt all of the elements of the offenses charged, you would be justified in returning a verdict of guilty.

We believe this instruction accurately described the jury's responsibility in evaluating the State's failure to produce the evidence. It clearly states that the jury should view the missing evidence in Harris' favor.

■ Nevertheless, Harris contends that the *Lolly* instruction was ineffective because the State was allowed to argue to the jury in closing argument, "You decide for yourself what it means once the judge tells you that the accidental markings did not match." This Court reviews for abuse of discretion a trial court's decision to overrule a timely objection to a remark made in a closing argument.[8]

In *Michael v. State*,[9] this Court relied upon the United States Supreme Court's words in

7. *Lolly,* 611 A.2d at 961.

8. *Grayson v. State,* Del.Supr., 524 A.2d 1, 2–3 (1987).

9. *Michael v. State,* Del.Supr., 529 A.2d 752, 762–63 (1987).

*United States v. Young* [10] for guidance when reviewing similar claims:

> Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.... Instead, ... the remarks must be examined within the context of the trial to determine whether the prosecutor's response is relevant.[11]

In the instant case, the prosecutor's remark was improper to the extent that it was an imprecise recitation of the effect of a *Lolly* instruction. In ruling on the objection, the Superior Court noted that both sides were focussing on different portions of the *Lolly* instruction. While Harris wanted to promote the inference concerning the missing evidence, the State emphasized the fact that the jury could be justified in returning a verdict of guilty. Recognizing this, the trial judge did not abuse his discretion in overruling the defense objection. Furthermore, directly following the prosecutor's rebuttal, the trial judge accurately instructed the jury in accordance with our decision in *Lolly.* We find the *Lolly* instruction acted as a curative instruction for both the missing evidence and the State's imprecise statement to the jury, rendering it unlikely that the jury could have been led astray. The instructions in the jury charge, that "what an attorney states in his or her opening or closing arguments is not in evidence" and may not be considered in reaching a verdict, further support this conclusion.

Since the record indicates that defense counsel requested the *Lolly* instruction,[12] Harris cannot be heard to cry foul in this Court. Any contrary result would defeat the purpose of giving a curative instruction and could ultimately require the declaration of a mistrial in practically every case where the State cannot account for the loss of material evidence. Our decisions in *Deberry* and its progeny were never intended to create such an anomalous result. We therefore hold that the instruction given remedied any prejudice the defendant might otherwise have suffered as a result of the State's negligence in handling the evidence and its imprecise statement to the jury in closing arguments.

### *The Jury Instructions on Accomplice Liability*

■ Harris contends that the Superior Court should have instructed the jury to assess Harris' guilt for the degree of the offense of homicide in accordance with his own culpable mental state, pursuant to Section 274 of the Criminal Code.[13]

■ The record reflects that Harris' attorney did not object to the Superior Court's formulation of the jury instructions on accomplice liability. This Court generally declines to review contentions neither raised nor fairly presented to the trial court for decision. "Accordingly, the failure to object at trial usually constitutes a waiver of a defendant's right to raise the issue on appeal unless the error is plain. Under that standard of appellate review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." [14]

■ Since the State sought a conviction for murder in the second degree and the lesser included offense of manslaughter, the jury was required, as a matter of Delaware law, to distinguish between Harris' liability

---

10. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

11. *Michael,* 529 A.2d at 762–62 (quoting *Young,* 470 U.S. at 11–12, 105 S.Ct. at 1044 (citations omitted)).

12. In a portion of the transcript in which the parties and the Superior Court discussed jury instructions for accomplice liability, Harris' attorney indicated that he requested and very much favored the Superior Court's *Lolly* instruction. *See* Trial Transcript of Prayer Conference 23–24; Appendix to Opening Brief, A–147–48.

13. 11 *Del.C.* § 274 provides:

> When, pursuant to § 271 of this title, 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance.

14. *Chance v. State,* Del.Supr., 685 A.2d 351, 354 (1996) (citations omitted).

for the offense of homicide and Harris' culpability for the degree of the homicide, i.e., the crime of murder in the second degree or manslaughter. A similar problem was addressed by this Court in *Chance v. State.*[15] In the instant case, as in *Chance,* the jury instructions for the lesser-included crime of manslaughter permitted the jury to return a verdict that was commensurate with Harris' own mental state.[16] Therefore, while the Superior Court's instructions to the Harris jury should have included the provisions in Section 274, the omission of that specific instruction does not constitute plain error.[17]

### Jonathan Brodie's Testimony

■ During the defense cross-examination of prosecution witness Jonathan Brodie, the witness asked during a sidebar conference if he could use the bathroom. Brodie was the driver of the car in which Harris was riding as a front-seat passenger when Glasco was killed. While in the bathroom, Brodie asked the bailiff if Brodie could speak to one of the prosecutors. The bailiff informed the trial judge, who denied Brodie's request.

At a sidebar, the judge informed counsel. Harris' attorney asked whether he could cross-examine Brodie about why he wanted to speak with a prosecutor. Concerned that Brodie's answer could cause a mistrial, the judge initially denied counsel's request, subject to a later application and further discussion. The trial judge denied counsel's renewed request to expand the scope of cross-examination. On appeal, Harris argues that the Superior Court abused its discretion when it denied him the opportunity to cross-examine Brodie regarding why Brodie asked to speak with the prosecutor while he was testifying.

The trial judge cited three bases for his ruling: (1) since it is inappropriate for the prosecutor to consult with a sequestered witness during trial testimony, it is likewise inappropriate for opposing counsel to inquire into what the witness would have said to the prosecutor;[18] (2) the testimony might not be relevant; and (3) the potential for injecting error into the proceedings. Harris' counsel was permitted to ask Brodie about the nature of his plea bargain, and did so. Moreover, further testimony, while relevant, would have been cumulative and might have raised the specter of a mistrial.

■ A trial judge has broad discretion in ruling upon the permissible extent of cross-examination, and such rulings will not be disturbed absent a clear abuse of that discretion.[19] Because of the questionable relevance of the testimony and potential for injecting error into the proceeding, we find that the court did not abuse its discretion when it ruled that Brodie's reasons for wishing to speak with a prosecutor while testifying were beyond the scope of cross-examination.

### Harris' Hearsay Objections

The third issue that Harris raises on appeal concerns two statements that, over objection, were admitted under Delaware Rule of Evidence 801(d)(2)(E).[20]

■ First, during the testimony of Jonathan Brodie, the State asked Brodie whether there was any conversation in his van from the time he left Southbridge until the gunfire started. Brodie answered affirmatively and

---

**15.** *Chance,* 685 A.2d at 351. The opinion in *Chance* was issued on November 8, 1996, nine months after Harris' trial.

**16.** *Chance,* 685 A.2d at 360.

**17.** *Id; cf. Probst v. State,* Del.Supr., 547 A.2d 114 (1988).

**18.** We do not find this basis compelling. The situation in which a prosecutor speaks with a witness raises concerns regarding coaching the witness that are not present in the situation in which opposing counsel questions a witness about his desire to speak with a prosecutor.

**19.** *Thompson v. State,* Del.Supr., 399 A.2d 194, 202 (1979).

**20.** D.R.E. 801(d)(2)(E) provides:

A statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court.

said that Kenny Davis [21] had said that he was going to hurt somebody. Defense counsel promptly objected on hearsay grounds. The trial judge overruled the objection—holding that the statement was admissible under D.R.E. 801(d)(2)(E) as a statement by a co-conspirator in furtherance of a conspiracy and that it was not offered for the truth of the matter.

Second, during the testimony of Marvin Harrigan, the State asked Harrigan about what was said during a conversation that he had with Harris and Oliver Cephas after Glasco was shot. Harrigan testified that during the conversation either Harris or Cephas said "we got that boy." Again defense counsel objected on hearsay grounds. Again the trial judge overruled the objection—holding that the statement was admissible under D.R.E. 801(d)(2)(E) as a statement by a co-conspirator in furtherance of a conspiracy and, in the alternative, that the statement was not hearsay because it was not offered for the truth of the matter. On appeal, Harris alleges that neither statement was admissible under D.R.E. 801(d)(2)(E) because the foundational requirements of the rule were never met.

■ Under D.R.E. 801(d)(2)(E), a statement that normally would be considered hearsay and therefore would not be admissible, may be admitted under an exception if the statement is offered against a party and is made by the party's co-conspirator during the course and in furtherance of the conspiracy.[22] "A statement qualifies as an exception if the offering party can show by a preponderance of the evidence that: 1) a conspiracy existed; 2) the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy; and 3) the statement was made during and to further the conspiracy."[23]

Harris argues that the trial court failed to determine that a conspiracy actually existed. Even if the trial court had enunciated an incomplete standard or failed to articulate all three elements of the co-conspirator exception, the record indicates that the trial court did not abuse its discretion in its evidentiary ruling. The evidence clearly established that: 1) a conspiracy existed;[24] 2) Harris, Brodie, Davis, Harrigan, and Cephas were members of the conspiracy; and 3) Brodie's and Harrigan's statements were made during and in furtherance of the conspiracy.[25] Therefore, the trial court did not abuse its discretion in admitting the statements into evidence.[26]

### Impeachment by Prior Conviction

Harris' final argument on appeal is that the Superior Court abused its discretion when it excluded certain evidence of prior crimes with which Harris sought to impeach three prosecution witnesses.

■ First, Harris sought to impeach David Smith with evidence of a March 1990 misdemeanor criminal mischief conviction. Smith was the first person to encounter the caravan of cars in the area of the crime scene, and testified as a fact witness for the State. Harris was able to impeach Smith with evidence of prior convictions for robbery second degree, three convictions for burglary, three theft convictions, and one conviction for receiving stolen property. The only dispute at trial concerned whether Harris could also impeach Smith with evidence of a criminal mischief conviction. Because minimal information was available concerning the criminal mischief conviction, the Superior Court

21. Kenny Davis was unavailable to testify because he was murdered prior to Harris' trial.

22. *Lloyd v. State*, Del.Supr., 534 A.2d 1262, 1264 (1987).

23. *Id.*

24. Harris' own statement of facts to his opening brief on appeal describes a "group of 22 eastsiders [who] decided to gather guns and ammunition and drive off in a caravan to the Wilmington's westside looking to 'hurt' Skeebo."

25. Brodie testified that, while he, Davis, Harris, Cephas and Carter were traveling to west Wilmington and prior to Glasco's being shot by someone in Brodie's van, Davis said that he was going to hurt somebody. Harrigan testified that he had a conversation with Harris and Cephas, the next day and before Harrigan threw the murder weapon into a pond, in which either Harris or Cephas said "we got that boy."

26. *See Lloyd*, 534 A.2d at 1265.

could not determine that it was a felony offense admissible under D.R.E. 609(a)(1). The Superior Court further determined that criminal mischief is not a crime involving dishonesty or false statement.[27] Thus, the Superior Court did not abuse its discretion in excluding that single conviction from evidence.

 Second, Harris sought to impeach Segiaray Lane with two juvenile felony convictions for attempted first degree robbery and receiving stolen property. Lane was riding his bicycle with the victim at the time of the shooting. He was a fact witness and not a co-conspirator. Lane had juvenile convictions for receiving stolen property, attempted robbery, and resisting arrest. D.R.E. 609(d) generally prohibits evidence of juvenile adjudications for impeachment purposes unless the Superior Court is "satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence."[28] Neither at trial nor on appeal can Harris explain why evidence of Lane's juvenile convictions is necessary for a fair determination of guilt and innocence. The Superior Court properly found that such impeachment evidence was not necessary, and therefore the Superior Court did not abuse its discretion by excluding the evidence.

Finally, Harris sought to impeach co-defendant Michael Kelson with evidence of two drug convictions for trafficking and possession with intent to deliver and with evidence of a 1984 juvenile theft conviction. Harris was permitted to impeach Kelson with a 1987 conviction for receiving stolen property. The Superior Court acknowledged that the drug offenses were felonies, but did not find that the probative value of the drug convictions outweighed their prejudicial effect, as required by D.R.E. 609(a)(1). The Superior Court properly found that the drug convictions did not involve dishonesty or false statement and therefore were inadmissible as impeachment evidence under D.R.E. 609(a)(2).[29] As to Kelson's 1984 juvenile theft conviction, the

Superior Court properly excluded this evidence because D.R.E. 609(d) generally prohibits the admission of both juvenile convictions and convictions more than ten years old. D.R.E. 609(d). Harris has not shown why the interests of justice required the admission of evidence of Kelson's 1984 theft conviction.

### Conclusion

We have carefully considered all of Harris' allegations of error by the trial court and we conclude that none has merit. Accordingly, we affirm the judgments of the Superior Court.

---

**27.** *See* D.R.E. 609(a)(2); *Gregory v. State,* Del. Supr., 616 A.2d 1198, 1204 (1992).

**28.** D.R.E. 609(d).

**29.** *See Gregory,* 616 A.2d at 1204.