IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 16, 2002 Session

## STATE OF TENNESSEE v. GREGORY SCOTT PAYNE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-D-2838     Walter Kurtz, Judge**

_____

**No. M2000-02900-CCA-R3-CD - Filed April 30, 2002**

_____

Defendant, Gregory Scott Payne, was indicted by a Davidson County Grand Jury for one count of sexual battery, one count of attempted rape, and two counts of rape. Following a trial, the jury found Defendant guilty of one count of sexual battery, a Class E felony, as a lesser-included offense of one of the rape charges, and not guilty of the remaining offenses. The trial court subsequently sentenced Defendant as a standard Range I offender to two years in confinement. In this appeal, Defendant asserts that (1) the evidence was insufficient to support his conviction, and (2) the trial court erred by denying his motion to strike the victim's testimony or declare a mistrial (based on the failure of the police to produce the taped recording of the victim's statement). Defendant also contends that the trial court erred by imposing the maximum sentence length and by denying him probation or any other form of alternative sentencing. After reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Fannie J. Harris, Nashville, Tennessee, for the appellant, Gregory Payne.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bernard F. McEvoy, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

The indictments in this case resulted from allegations made by A.G. (we will use the initials of the minor victim) against her cousin's boyfriend, the Defendant. Specifically, A.G. alleged that Defendant raped her three times during the summer of 1999: June 19th, on or about June 29th, and July 3rd. A.G. was fourteen years old at that time.

A.G. testified at trial that she resided in Lewisburg with her mother, stepfather, and sister, Sherry, while school was in session. During the summertime, A.G. and Sherry visited different relatives, usually aunts, and stayed with them for approximately a month. In 1999, the girls spent from June 8th to July 4th with their twenty-one-year-old cousin, Mercresha, in Nashville. Six other persons also shared the two-bedroom apartment that summer: A.G.'s aunt, Regina, who was also Mercresha's mother; Mercresha's boyfriend, Defendant; and Cameron, Tanesha, Savon, and Tony, four other children who ranged in ages from approximately eight years to ten months old. The youngest child, Tony, was the only child parented by Defendant and Mercresha. Mercresha, Defendant, and Tony slept in one bedroom. A.G., Sherry, and Aunt Regina slept in the living room. The remaining three children slept in the second bedroom.

A.G. testified that Mercresha went out on the weekends, usually to clubs with her mother or her friends. Defendant had only accompanied her one time that A.G. knew of. Usually, he would stay at home with the children, and, when he did, he was the only adult present. It was on three such occasions that Defendant "had sex" with A.G.

According to A.G., the first time occurred on June 19, 1999. (She said that she recalled the date because it happened on a Saturday night, a week or two after she arrived in Nashville.) A.G. had fallen asleep on the couch. She was wearing a long T-shirt and panties, with a blanket covering her. Other children were also sleeping in the living room at the time, including Defendant's daughter, Amanda, who was visiting for Father's Day. A.G. awoke when Defendant began touching her chest area. A.G. told him to stop, but he did not. Instead, he "opened her legs" and pulled off her panties. Next, Defendant got on top of her. Her hands were pinned to her head by Defendant's hands. He then "stuck his thing in" but pulled it out after she said "stop" a few more times. A.G. claimed that it felt as though something were "stabbing" her. When he finished, he went upstairs. Later, he returned and asked her whether she planned to tell Mercresha. A.G. replied affirmatively. Defendant said, "If you tell, you'll hurt the baby because you'll break up me and Cresha." A.G. then agreed not to tell anyone "this time." She testified that she wanted to inform someone of what Defendant had done, but did not want the baby, Tony, to grow up without a father. The prosecutor then asked whether A.G. was alone when this incident occurred. A.G. responded that she was alone, except for five-year-old Tanesha, who did not wake up. She claimed that all of the other children had gone upstairs (contradicting earlier testimony).

-2-

A.G. testified that the second incident occurred on June 29th or 30th, in the upstairs bedroom generally used by the three younger children (the "baby's room"). She recalled the date because she had been to a concert earlier that week. A.G. was sleeping in the baby's room, rather than the living room, on that particular evening because Sherry had requested the couch. Mercresha had gone to a club to pick up Regina, and the other children had fallen asleep watching television downstairs. Defendant entered while A.G. was sleeping, woke her up, and instructed her to get onto the floor because "the bed was too loud." Next, he directed her to "open her legs." A.G. told him to stop and pushed his hand away, but Defendant did not comply. A.G. was wearing a T-shirt and pink panties. Defendant removed her panties and "stuck his penis out again." What Defendant was doing knocked the wind out of her and hurt for a while this time because he "moved up and down" and "stayed longer." She explained that he did not move much the first time. A.G. also testified that "wet stuff" came out of Defendant's penis, which ended up on her panties because Defendant wiped himself off with them when he was through. After Defendant left the room, A.G. went into the bathroom and cleaned herself with a wet rag. The pink panties lay in the dirty clothes basket where Defendant threw them.

A.G. testified that the third incident occurred on July 3, 1999. Mercresha had gone out earlier that evening and had not returned yet. The other children were sleeping downstairs. A.G. had just taken a shower and fallen asleep in the baby's room. She was wearing a nightgown and red panties. Defendant came into the room and woke her up. He then commanded her to take her panties off and get on the floor again. She took off her panties and sat back onto the bed. Next, Defendant pulled out his penis and asked her to perform fellatio on him. When A.G. refused, Defendant said, "Well, play with it," and she declined. So Defendant told her to get onto the floor and then "stuck his thing inside of [her] again." He covered her mouth to keep her quiet. She saw "wet stuff" come out of his penis again. This time, he wiped himself off with a shirt which had been lying on the floor nearby. When Defendant finished, A.G. cleaned herself in the bathroom with a wet rag. A.G. testified that she never informed anyone that the above incidents had occurred because Defendant frightened her. She further stated that she did not want to have sex with Defendant or consent to same.

On July 4th, A.G. and her sister returned to Lewisburg to attend a cookout held by one of her aunts. The entire family was invited, and Mercresha drove everyone but Tony to the festivities. A.G. learned that her thirteen-year-old cousin, Megan (Mercresha's sister), had told Defendant she "loved" him in a telephone conversation earlier that day. A.G. warned Megan that she should be careful about what she says to Defendant. A.G. told Megan that her warning was based on "experiences" she has had with him. A.G. testified that Megan must have informed her mother, Regina, of their conversation, because Regina came to her later and asked what happened. A.G. told her only that Defendant had touched her. When they arrived at A.G.'s home sometime after midnight, A.G. told her mother the "whole story." Her mother then reported the incidents to the Nashville police.

A.G. further testified that the next day, July 5, 1999, she and her mother returned to Nashville for a medical examination at General Hospital. A.G. had not showered since the third incident on

July 3, 1999. Later, A.G. assisted her mother with the laundry chores. While they were separating the dirty laundry she had brought back from Nashville, A.G. discovered the pink and red panties she had worn during the second and third incident with Defendant. Her mother bagged them and later gave them to the police. A.G. identified the two pairs of panties presented to her at trial as the same panties worn during the incidents and subsequently turned over to the authorities.

During cross-examination, A.G. testified that she and her sister had searched Mercresha's apartment to collect their dirty clothing prior to departing Nashville and they discovered their clothes in numerous places. The laundry they brought home was not separated in any way, but mixed together in a big plastic bag. When questioned about her warning to Megan, A.G. testified that she cautioned her because she was afraid Defendant "might try something on her." A.G. also reiterated that she kept quiet about Defendant's conduct to keep the family together. A.G. grew up without a father and did not want Tony to have the same experience. A.G. stated that it had occurred to her that a person who did things similar to what Defendant did to her could conceivably go to jail; she had learned this from television and the movies. However, she did not believe that it would actually happen to Defendant, until a man named Detective Mann told her so at the hospital. Instead, she had assumed that Defendant would receive a warning of some sort and that he and Mercresha would probably break up. A.G. denied that she was angry with Defendant, prior to the three incidents where he raped her.

A.G. testified that she recalled talking to Detective Mann while at the hospital on July 5, 1999. Her mother and stepfather were also present. She told Detective Mann that she had been raped by Defendant and gave him the dates of the incidents, but she did not furnish him with any details. On the Friday following her return home, A.G. gave a statement to Detective Carter in the kitchen of her home. She recalled that he took notes and that a tape recorder was running the entire time they spoke. When she was finished with her statement, Detective Carter played the complete statement back to her and asked her questions about various things she said. He did not explain why he had replayed the tape and did not state that he had concerns to her about anything she said. Rather, he pointed out which parts were "important," asking her whether she was certain it happened that way. He informed her that the tape would be used in court. According to A.G., he did not re-record any parts of her statement. If something was unclear, he made a notation on paper. Detective Carter took with him the two pairs of panties that she and her mother had discovered in the laundry.

During redirect examination, the prosecutor asked A.G. whether her testimony in court that day differed in any respect with the statement she gave Detective Carter in July 1999. A.G. answered, "No, not really." On recross-examination, Defendant's counsel questioned A.G. as to what she meant by "not really." She responded "I told him the same story I told you all. It's the same." Defendant's counsel then asked her, "Could you have told him something different?" A.G. replied, "No. That's what happened, the same thing I told you all."

In June 1999, Detective Ron Carter worked in the investigative division of Youth Services for the Metro Police Department in Nashville. This division investigates allegations concerning the physical and sexual abuse of children, and he was the investigator in A.G.'s case. Acting in this

capacity, Detective Carter first spoke with Ms. Hayes, A.G.'s mother, over the telephone. Ms. Hayes informed him that she possessed the two pairs of panties worn by A.G. during the sexual assault. He instructed Ms. Hayes to place them into a paper bag until he had an opportunity to retrieve them. After collecting the panties, he delivered them to the Tennessee Bureau of Investigation's crime lab to be analyzed for presence of spermatozoa. At a later point in the investigation, Detective Carter also delivered to the crime lab a rape kit and samples of Defendant's blood.

During cross-examination, Detective Carter admitted that he interviewed A.G. and that he tape recorded the interview session. However, he was uncertain of the tape's location at that time. The police were looking for it. Detective Carter also conceded that numerous other witnesses had been interviewed in connection with this case and those interviews were also tape recorded, but none of those tapes were missing.

Suzanne Ross, a pediatric nurse practitioner, testified that she worked at the "Our Kids Center" ("Center") located at 1900 Hayes Street in Nashville. The Center's function is to conduct medical evaluations of children when allegations of sexual abuse are involved. Ms. Ross examined A.G. on July 5, 1999 in the emergency room of General Hospital in Nashville. She testified that child victims of sexual abuse are typically seen at the hospital, rather than the Center, when the alleged sexual abuse had occurred within 72 hours. This is because forensic evidence may be collected and prophylactic treatment for pregnancy and/or sexually transmitted diseases might be required, all of which cannot be done at the Center. In A.G.'s case, Ms. Ross examined the genital area and collected a "rape kit." Collecting a rape kit requires that the examiner swab the internal and external areas of A.G.'s vagina with a Q-tip. The evidence is then analyzed by the TBI at a later date to determine whether semen and sperm or disease were present, although the success rate for finding sperm typically plummets after eight to twenty-four hours has passed.

Ms. Ross testified that the visual examination of A.G.'s genital area revealed two abraded areas, which could also be described as "irritations of the skin." (The examination was normal in all other respects.) One abrasion was located at the junction of the labia and minora; the other was near the posterior fourchette. Anatomically, these structures are classified as "external genitalia." A.G.'s hymen was intact, yet penile penetration does not necessarily tear the hymen. When asked whether penile penetration could have occurred in her case, Ms. Ross responded that "it could have." However, other things could also have caused the abrasions. The abrasions were classified as "non-specific," which means that they could have resulted from intense scratching of the area, soap residues, or perfume, rather than a penetrating injury. The findings in this case were more consistent with "vulva contact," as opposed to "true vaginal penetration," but this "does not mean that vaginal penetration did not occur." She testified that A.G. did not complain that she had previously experienced any itching or discomfort.

During cross-examination, Ms. Ross testified that the examination of A.G.'s vagina revealed no tears, redness, bruising, or any other evidence of internal penetrating injury. She also testified that, in fact, vaginal penetration can occur without any physical signs. According to Ms. Ross, normal exams are more common than those which reveal a significant amount of tearing and

bruising, and, even after forcible rape, no signs of physical injury may be present. A.G. reported to Ms. Ross that she had been raped three times and gave specific dates of the incidents. She also said that she "felt something wet entering into her."

Upon redirect examination, Ms. Ross testified that her findings were not inconsistent with A.G.'s account of what happened between her and Defendant, namely, full penile penetration on three different occasions. During recross-examination, Ms. Ross also testified that none of the physical findings were indicative of penetration trauma.

Michael Alexander Turbeville, an analyst working in the serology DNA unit of the TBI's crime lab, testified that he was asked to examine the evidence in A.G.'s case. In addition to a vaginal swab and microscope slide, the sexual assault kit received by the crime lab contained a pair of pink panties and blood sample from the victim. Subsequent testing revealed no evidence of sperm on either the swab or the microscope slide. By contrast, the pink panties yielded positive results for semen following a presumptive test. The crime lab then acquired a sample of Defendant's blood. The presence of semen and sperm were confirmed, and the DNA in the sperm were an "exact match" to that of Defendant. Other material collected from the panties, referred to as a "non-sperm fraction," matched the victim's. This indicated that the panties belonged to or had been worn by her. In addition, DNA from a third person was also discovered, but it was a minute amount and Turbeville was unable to determine whether it was male or female.

Patsy Hayes, A.G.'s mother, testified that she first learned of her daughter's experiences with Defendant from her sister, Regina, at approximately midnight on July 4, 1999. Regina told her only that Defendant had been fooling around with A.G. and that she did not know how far it had gone. Consequently, Ms. Hayes questioned her daughter in an effort to discover whether what Regina had told her was true. They talked for a couple of hours. A.G. told her that Defendant made her have sexual relations with him and that she tried to refuse him. She also claimed that Defendant "threatened" her. Specifically, Defendant warned A.G. that if she told anyone, he would stop seeing Tony and come to Lewisburg looking for her. Ms. Hayes testified that, initially, A.G. appeared frightened, embarrassed, and humiliated and she did not want to talk at all.

After talking with A.G., the first thing Ms. Hayes did was alert the Rape Crisis Center, which instructed her to take A.G. to General Hospital. She did this the next day, July 5, 1999, and then she called the police. The following day, July 6, 1999, Ms. Hayes discovered A.G.'s pink and red panties while doing laundry. They were in a bag with all of the other clothing that A.G. and Sherry had brought back from Nashville. After A.G. informed her that "them were the panties she had on when [Defendant] wiped hisself [sic] off," she bagged them to give to the police. She eventually turned them over to Officer Carter.

Perrione Wigfall testified that Defendant was the father of her daughter, Amanda, and that Amanda did not visit Defendant on Father's Day in June 1999. Ms. Wigfall testified that, in fact, Amanda did not visit her father on any holidays.

Gregory Scott Payne, the Defendant, testified that A.G. was the cousin of his girlfriend, Mercresha Greer, but they had stopped seeing each other. Defendant admitted that he stayed overnight at Mercresha's apartment, usually Monday, Tuesday and Wednesday, during the summer of 1999. He said that sometimes he would visit on Saturday also, but on these occasions he would return home that night to prepare for church on Sunday. Defendant admitted having a sexual relationship with Mercresha, but denied that he intentionally touched A.G.'s breasts or "bottom" or that he had sexual intercourse with her.

During cross-examination, Defendant testified that he was currently thirty years old and that Mercresha's age was twenty-one. Defendant had a son named Tony, who would be two years old in August 2000, and a daughter named Amanda, who would be eleven years old in September 2000. He claimed that Amanda's mother was twenty-four years old at that time. Defendant further testified that he had lived with his mother for his entire life. He spent the night at Mercresha's apartment on the weekends, as well as on Monday, Tuesday, and Wednesday. Defendant admitted that when Mercresha went out on the weekends in the summer of 1999, he would be left at home and alone with the six children. At night, A.G. and her sister, Sherry, slept on the couch together. Defendant slept upstairs with Mercresha and Tony.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his conviction because the victim did not testify that he committed any sexual offense on June 25, 1999, the date specified in the indictment. The State acknowledges that a variance exists between the date of the offense as alleged in the indictment and the proof of the criminal act presented at trial. However, the State argues that this variance is not fatal, as long as the date alleged for the commission of the offense preceded the date of the finding of the indictment. Further, unless "time is of the essence" in the offense, the State contends that the indictment need not even state the date of the offense.

Count three of Defendant's indictment alleged, in relevant part, the following:

GREGORY SCOTT PAYNE

on the 25th day of June, 1999, in Davidson County, Tennessee and before the finding of this indictment, did intentionally, knowingly, or recklessly engage in unlawful sexual penetration of [A.G.] (D.O.B. 7/26/84), and force or coercion was used to accomplish the act, in violation of Tennessee Code Annotated § 39-13-503, and against the peace and dignity of the State of Tennessee.

The victim, A.G., testified that the second incident of sexual misconduct occurred on June 29th or 30th. This was the sole proof of the date of the offense as alleged in count three. The indictment was filed on December 2, 1999.

Under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution, an accused is entitled to notice of the nature and cause of the accusation. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). An indictment must provide a defendant with notice of the offense charged, provide the court with an adequate ground upon which a proper judgment may be entered, and provide the defendant with protection against double jeopardy. State v. Lemacks, 996 S.W.2d 166, 172 (Tenn. 1999); Hill, 954 S.W.2d at 727; State v. Byrd, 820 S.W.2d 739, 740-741 (Tenn. 1991); see also Tenn. Code Ann. § 40-13-202 (1997). These constitutional and statutory directives do not expressly require that the time of the commission of the offense be stated in the indictment. In fact, "[t]he rule of law is well-established in Tennessee that the exact date, or even the year, of an offense need not be stated in an indictment … unless the date or time is 'a material ingredient in the offense.'" Byrd, 820 S.W.2d at 740; see also Tenn. Code Ann. § 40-13-207 (1997) (the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before such time, unless the time is a material ingredient in the offense). When the indictment and proof substantially correspond, the variance is not to be regarded as material. Berger v. United States, 295 U.S. 78, 82-84, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935).

Thus, a variance between the time of the commission of the offense alleged in the indictment and the time established by the proof at trial is rarely fatal. State v. Ealey, 959 S.W.2d 605, 608 (Tenn. Crim. App. 1997) ("[T]he State is not required to strictly show that the offenses occurred on or during the dates alleged in the [indictment] unless the dates are essential to proving the offense or imposing a defense."); State v. West, 737 S.W.2d 790, 792-793 (Tenn. Crim. App. 1987) (unless the time of the commission of the offense is an essential element of the offense or time will bar the commencement of the prosecution, "the time of the commission of the offense averred in the indictment is not material and proof is not confined to the time charged"); State v. Fears, 659 S.W.2d 370, 374 (Tenn. Crim. App. 1983). The United States Supreme Court has held that reversible error exists only when the variance between the indictment and the proof is such that it affects a defendant's substantial rights. See Berger, 295 U.S. at 79-82, 55 S.Ct. at 629-630 (a variance is not fatal if (1) the defendant is sufficiently informed of the charges against him so that he can adequately prepare for trial and, (2) the defendant is protected against a subsequent prosecution for the same offense based on double jeopardy grounds).

In State v. Moss, 662 S.W.2d 590 (Tenn. 1984), our supreme court announced the following similar standard for evaluating variances between an indictment and the evidence presented at trial:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

Id. at 592; see also State v. Bush, 942 S.W.2d 489, 519-20 (Tenn. 1997).

-8-

Applying the above principles to the instant case, we find that the date of the offense was not a material ingredient. See Byrd, 820 S.W.2d at 740. The proof at trial showed that Defendant committed the offense at issue on June 29th or 30th; the date alleged in the indictment only differed by four or five days. Thus, the indictment and proof substantially correspond. Berger, 295 U.S. at 82-84, 55 S.Ct. at 631. Moreover, the date was not an essential element of the offense, was not necessary to imposing a defense, and did not act as a time bar to prosecution. Because the date was clearly not a material ingredient, the offense may be alleged to have been committed on any day before the finding of the indictment, which was filed on December 2, 1999. Tenn. Code Ann. § 40-13-207 (1997).

We also conclude that Defendant was sufficiently informed of the charges against him so that he could adequately prepare for trial. Moreover, the variance did not leave him unprotected against a subsequent prosecution for the same offense. See Berger, 295 U.S. at 79-82, 55 S.Ct. at 629-630; Moss, 662 S.W.2d at 592. Thus, Defendant's substantial rights were not affected and reversible error did not occur.

We now turn to the issue whether the evidence was sufficient to support Defendant's conviction for sexual battery.

When evidentiary sufficiency is questioned on appeal, the standard of review is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Instead, on appeal the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. Hall, 8 S.W.3d at 599. A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory, effectively removing the presumption of innocence and replacing it with a presumption of guilt. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters to be resolved by the trier of fact, not this Court. Id. The defendant bears the burden of demonstrating that the evidence is insufficient to support his or her conviction. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Sexual battery" is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by one of four enumerated circumstances. See Tenn. Code Ann. § 39-13-505 (1997). In this case, the jury was instructed that the evidence must show that Defendant used force or coercion to accomplish the act, see id. § 39-13-505(1), and that Defendant acted intentionally, knowingly, or recklessly. See id. § 39-11-301(c). "Sexual contact" is defined as

-9-

the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Id. § 39-13-501(6). "Intimate parts includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(1).

The evidence against Defendant consisted primarily of the victim's testimony and the presence of Defendant's DNA on the crotch of the victim's panties. Specifically, the victim testified that Defendant came into the room she was sleeping in, removed her panties, spread her legs, and engaged in sexual intercourse with her. He then used the victim's panties to wipe up his ejaculate and placed them into the laundry hamper. The DNA recovered from the pink panties exactly matched that of Defendant. After considering this evidence in the light most favorable to the State, we conclude that it was sufficient so that any rational trier of fact could have found that Defendant had unlawful sexual contact with the victim, that he used force to accomplish the unlawful act, and that the elements were proved beyond a reasonable doubt. Defendant contends that his conviction was based primarily on the victim's testimony and that her testimony was not credible. Determinations concerning credibility are matters entrusted solely to the jury, however, and the jury in this case apparently resolved any conflicts in favor of the victim. This Court will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. Defendant is not entitled to relief on this issue.

## II.  Denial of Defendant's Motion

Defendant contends that the trial court erred by denying his motion to strike the victim's testimony or, in the alternative, declare a mistrial. Defendant's motion was based on the fact that the police were unable to locate the tape recording of their interview with the victim when Defendant's counsel requested it for purposes of impeaching the victim's testimony at trial. Defendant argues that the failure of the police to produce this evidence violated Rule 26.2 of Tennessee's Rules of Criminal Procedure and rendered his trial fundamentally unfair. Defendant asserts that the appropriate remedy in his case was to strike the victim's testimony or declare a mistrial, and the trial court erred by refusing to do either. We disagree.

According to the record, this specific issue was initially presented to the trial court during a jury-out recess on the first day of trial. The State had just concluded its direct examination of the victim. Defendant then moved to strike the victim's testimony based on a "Jencks violation" by the State. Defendant had just learned that the tape of the victim's prior statement to the police could not be located and asserted that a proper cross-examination of the victim would be impossible without the ability to impeach her testimony.

In response, the prosecutor acknowledged that the report prepared by the investigator of the case, Detective Ron Carter, contained the sentence: "[A.G.] said she was assaulted on three dates (see taped interview)." The prosecutor claimed that the Youth Services Division informed his office that all of the tapes had been sent and that Detective Carter was uncertain whether a tape of the victim's statement even existed. According to the prosecutor, everything "memorialized in writing" concerning the victim's statement had been given to Defendant.

The court questioned the victim at this point, and she confirmed that her statement had been tape recorded. The trial court concluded that Defendant was entitled to a jury-out hearing to determine what had happened to the tape but, until that happened, the court intended to go forward with Defendant's cross-examination of the victim. (Detective Carter was not available to testify at that time.) The trial court denied Defendant's request that he be allowed to postpone the cross-examination of the victim until after the court had a chance to rule on this issue.

At the conclusion of the victim's testimony, the trial court conducted a jury-out hearing to discover what circumstances led to the disappearance of the tape. During the hearing, Detective Carter acknowledged that he was assigned to A.G.'s case and that he interviewed her during his investigation. He recalled recording A.G.'s statement on tape, but he was uncertain whether he took notes. Carter claimed that he was unaware the tape was missing until that day and he was unaware of the tape's then-present whereabouts, but he could testify as to his standard procedures for handling similar evidence. To this end, Carter explained that, after concluding the taping of a witness' statement, he would give the tape to his secretary or leave it on her desk. She would then record or log the tape into evidence and place it into a locked facility. Regarding the tape in issue, Carter did not recall whether he gave it to the secretary personally or left it on her desk. He was certain that it was named and labeled with the complaint number, however, because he always did that. Carter testified that tape recordings normally stay in storage unless someone requests them, at which point a copy is made. With regard to the tape of A.G.'s statement, the record does not show that the tape was ever logged in. Carter testified that he asked the person responsible for keeping them to search for the tape. The district attorney had also requested a search. The records reflected that no one had requested the tape, so its disappearance was thus far a mystery. Carter testified that the tape may have been misfiled, as happened one time in 1999. The police department was looking into that possibility.

The prosecutor asked Carter if he recalled whether the victim, A.G., had recanted at any point during her statement. Carter replied, "To the best of my knowledge, no, sir, she did not." Carter recalled that they discussed her allegations against Defendant and that her account was consistent with the other information he had received. Carter denied that he concealed or destroyed the tape.

At the conclusion of the hearing, Defendant renewed his motion to strike the victim's testimony from the record. The trial court denied the motion.

Defendant contends that the State's failure to produce the tape of the victim's statement violated Rule 26.2 of Tennessee's Rules of Criminal Procedure. Rule 26.2(a) provides the following:

> After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

Section (e) of the same rule concerns sanctions for failure to produce the witness' statement requested pursuant to part (a):

> If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.

Tenn. R. Crim. P. 26.2(e). The language of subsection (e) provides sanctions when the other party *elects not to comply* with an order to deliver a statement to the moving party. We do not believe that the State "elected" not to comply here. According to the testimony of Detective Carter, the tape was most likely misplaced. There is no proof that it was intentionally misplaced. We also do not believe that a mistrial was warranted. Instead, our analysis of this issue is guided by the decision of our supreme court in State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999).

The question presented to the supreme court in State v. Ferguson was: What consequences should flow from the State's loss or destruction of evidence alleged to have been exculpatory. Id. at 915. Significantly, Ferguson also concerned evidence, the true nature of which (exculpatory, inculpatory, or neutral) could never be determined. Our supreme court began by rejecting an analysis based primarily on proof of the State's bad faith, used by the United States Supreme Court in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and embraced by many other states. Ferguson, 2 S.W.3d 916. Rather, the court was persuaded that due process claims arising out of lost or destroyed evidence must be evaluated by balancing various factors, similar to the analysis adopted by the Delaware Supreme Court in Hammond v. State, 569 A.2d 81, 87 (Del. 1989). Id. at 916-17 (after having determined that the state had breached a duty to preserve evidence, the Delaware Supreme Court focused on three factors: (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence, considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to sustain the conviction). Our supreme court deemed the preservation of a defendant's fundamental right to a fair trial of paramount importance and adopted for Tennessee a balancing approach similar to the one set forth in Hammond. Id. at 917.

Under Ferguson, when the loss or destruction of evidence occurs, the first step is to determine whether the State had a duty to preserve the evidence in question. Observing that the boundaries of such a duty may be difficult to define, the Ferguson court quoted from California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2533-34, 81 L.Ed.2d 413 (1984), in which the United States Supreme Court held:

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Once the proof demonstrates the existence of a duty and the state's failure in that regard, the court must make a decision regarding the consequences of the breach. Specifically, the court should examine (1) the degree of negligence involved; (2) the significance of the missing evidence, taken in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. Ferguson, 2 S.W.3d 917. If, after considering the above factors, the trial court concludes that a trial without the missing evidence would not be fundamentally fair, the trial court may dismiss the charges or craft appropriate instructions for the jury. Id. (The court did not state that these options should be considered the sole remedies or be exclusive of any other.)

Turning to the case before this Court, we find that the State had a duty to preserve the tape recording of Detective Carter's interview with the victim. Although the exculpatory nature of the evidence has considerable significance in an evaluation of the State's duty, see id., and the exculpatory nature is, in this case, questionable, it nevertheless could be considered material to the preparation of Defendant's defense, at the very least. In other words, it may have had some value in impeaching the credibility of the victim.

Accordingly, we must now determine what consequences should flow from the breach. The first factor considers the degree of negligence involved. We first note that the proof fails to indicate any bad faith on the part of the State. The only question then is what degree of negligence was involved in the loss of the tape. We conclude the proof supports a finding of simple negligence, as compared to gross negligence. Detective Carter testified that he did what he has always done, and the record does not indicate that the police department's evidence storage facility has had any other problems with missing or lost evidence in the past, with the exception of one misfiled tape in 1999. Therefore, we find that the conduct of law enforcement in this matter constituted simple negligence.

The second factor addresses the significance of the missing evidence, in light of the probative value and reliability of secondary or substitute evidence that remains available. Defendant contends that the tape recording was critically important and necessary to impeach the victim's credibility. This contention is unsupported by any evidence in the record, however. When the prosecutor asked

Detective Carter whether the victim, A.G., recanted during her statement, Carter replied, "To the best of my knowledge, no, sir, she did not." Carter also stated that her account was consistent with the other information he had received. A.G. recalled that Detective Carter took notes during her interview and that a tape recorder was running the entire time they spoke. Detective Carter then played the complete statement back to her and asked her questions about various things she said and whether she was certain it happened that way. According to A.G., he did not re-record any parts of her statement and, if something was unclear, he made a notation on paper. Detective Carter's notes were later given to Defendant. When A.G. was asked whether her testimony in court that day differed in any respect with the statement she gave Detective Carter, she answered, "No, not really." Defendant's counsel then questioned A.G. as to what she meant by "not really," and she affirmed that her story had not changed. Based on this proof, we are unpersuaded that the tape had significant probative value, i.e., that it would have been of considerable assistance in discrediting the victim's account of the events. Moreover, it appears that some secondary evidence was available. The State claimed that Defendant was given the notes taken by Detective Mann when A.G. spoke with him at the hospital on July 5, the notes taken by Detective Carter during his interview on July 15th, and the information collected during an interview conducted at the Our Kids Center (date not specified).

The third factor, sufficiency of the other evidence used at trial, also fails to support Defendant's argument on this issue. Even if the victim's credibility was attacked by inconsistent prior statements, there was evidence of Defendant's sperm and DNA on the victim's panties, despite the fact that Defendant denied having any sexual relations with the victim.

As a remedy in this situation, the trial court chose to give the jury the following instruction concerning the missing tape: "If you find that the State has lost the tape recorder whose contents might or might not have been helpful to the defense, they you may consider this lost tape in assessing the strength of the State's proof." Although there is a more detailed instruction set forth in Ferguson, see id. at 917 n.11, the instruction given in this case was sufficient in that it told the jury to consider that the State misplaced the tape and that it may have been helpful to Defendant's case. In his brief, Defendant asserts that the instruction was inadequate for failing to apprise the jury of the tape's contents, i.e., that the tape contained the victim's interview with the police. We disagree. The jury was made aware of the tape's content during the testimonies of both the victim and Detective Carter.

In sum, we believe that Defendant's defense was not hindered to any significant degree by the missing tape. We further conclude that he received a fundamentally fair trial and that the trial court's decision to give an instruction to the jury on this matter, in lieu of granting a mistrial or striking the victim's testimony, was not reversible error. Defendant is not entitled to relief on this issue.

## III. Sentencing

Defendant contends that the trial court erred by imposing the maximum sentence length allowed for his conviction and by denying Defendant full probation or any other form of alternative

sentencing. With regard to the term of his sentence, Defendant argues that (1) one of the enhancement factors applied by the trial court was not proven by a preponderance of the evidence, as required by State v. Winfield, 23 S.W.3d 279 (Tenn. 1998), (2) a second enhancement factor was applied in error, and (3) the trial court failed to give appropriate weight to the mitigating factors applicable in his case. Regarding the manner of service of his sentence, Defendant asserts that (1) the trial court failed to properly address his potential for rehabilitation or treatment in the community, and (2) the trial court failed to make the findings of fact which are necessary, as a matter of law, prior to ordering a sentence of confinement. We disagree.

At Defendant's sentencing hearing on August 31, 2000, Defendant testified that he never touched the victim, A.G., and, therefore, he was unable to accept the verdict in this case. Defendant claimed to be a "hard-working man" who wanted to care for his family and, especially, his mother. Defendant's mother was ill and unable to properly care for herself alone. At that time, Defendant lived with his mother and stated that, if granted probation, he would continue to do so. He was also employed and gave the majority of his spendable income to his mother and his child, Amanda, in the form of child support. Defendant stated that his criminal history included only a misdemeanor conviction for gambling and a charge of trespassing.

During cross-examination, Defendant testified that his daughter, Amanda, was eleven years old and that the mother of his child, Perrione Wigfall, was approximately twenty-three years old. When questioned further, Defendant claimed that Ms. Wigfall was close to his own age, thirty-one. The State pointed out that, mathematically, there is a difference of eight years in their ages. Defendant conceded this, but claimed that Ms. Wigfall was not twelve years old when they dated.

Mary Payne, Defendant's mother, testified that Defendant lived with her and that he assisted her financially. She stated that she was sixty-seven years old and she needed Defendant to live with her because she was ill. Ms. Payne further testified that if Defendant was granted probation, she would take full responsibility for him.

At the conclusion of proof at the sentencing hearing, the trial court found that two enhancement factors applied in Defendant's case: "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1), and "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ." Tenn. Code Ann. § 40-35-114(4) (1997). With regard to the first enhancement factor, the trial court stated that it accredited the testimony of the victim, A.G., "in all respects." Accordingly, it found by a preponderance of the evidence that Defendant had raped her. Concerning the second enhancement factor, the trial court noted only that the victim's age at the time of the crime (fourteen) made this factor applicable. The trial court also stated that it gave the greatest weight to the enhancement factor involving Defendant's prior criminal behavior.

The trial court observed that Defendant submitted numerous mitigating factors; a total of fifteen according to the presentence report. However, the record reveals that the trial court only commented on the mitigating factor applicable when the defendant's conduct "neither caused nor

threatened serious bodily injury." Tenn. Code Ann. § 40-35-113(1) (1997). Specifically, the trial court refused to mitigate Defendant's sentence based on a lack of physical injury to the victim but stated that, even if this factor did apply, the small consideration it deserved would be substantially outweighed by the enhancement factors.

Next, the trial court acknowledged that Defendant was presumed to be a candidate for alternative sentencing, but found that the proof of Defendant's criminal behavior overcame the presumption. Accordingly, the trial court sentenced Defendant as a standard Range I offender to two years in confinement.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d), 402(d) (1997). If the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Therefore, meaningful appellate review requires that the trial court place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor applied, and articulate how the mitigating and enhancement factors were evaluated and balanced in determining the sentence. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997); see Tenn. Code Ann. § 40-35-210(f) (1997). The burden is on the appealing party to show that the sentencing is improper. Tenn. Code Ann. § 40-35-401 (1997), Sentencing Commission Comments.

In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Id. §§ 40-35-102, 103, 210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class E felony is presumptively the minimum sentence in the range when no enhancement or mitigating factors are present. See Tenn. Code Ann. § 40-35-210(c) (1997). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Id. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the Sentencing Act, and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

-16-

**A. Sentence Length**

Defendant argues that his sentence is excessive because (1) the enhancement factor based on his criminal behavior was not proven by a preponderance of the evidence, as required by <u>State v. Winfield</u>, 23 S.W.3d 279 (Tenn. 1998), (2) the enhancement factor based on the victim's age was applied in error, and (3) the trial court failed to give appropriate weight to the fifteen mitigating factors submitted in his case.

First, we observe that Defendant's reliance on <u>Winfield</u> to refute the trial court's application of the first enhancement factor is misplaced. In <u>Winfield</u>, our supreme court stated that "a sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted so long as the facts are established in the record by a preponderance of the evidence." <u>Id.</u> at 281; <u>see also</u> <u>State v. Carico</u>, 968 S.W.2d 280, 288 (Tenn. 1998) (the admission of evidence of sexual acts–other than the acts for which the defendant was convicted– at the sentencing hearing did not violate the appellants right to due process). Here, the trial court stated that it accredited the testimony of the victim. The trial court then used this proof to find by a preponderance of the evidence that Defendant had raped her. The victim's testimony constitutes adequate support for the trial court's finding. Thus, we find no error in the court's application of enhancement factor (1). Further, since we find that the trial court generally complied with the purposes and principles of the Sentencing Act and its findings regarding this factor are adequately supported by the record, the great weight attributed to this factor is within the trial court's discretion, and we find no abuse.

We have come to an inapposite conclusion concerning the second enhancement factor, however, which is applicable when "a victim of the offense was particularly vulnerable because of age or physical or mental disability. . . ." Tenn. Code Ann. § 40-35-114(4) (1997). In <u>State v. Adams</u>, 864 S.W.2d 31 (Tenn. 1993), our supreme court provided a framework for application of this factor, stating that enhancement of a sentence based on vulnerability "relates more to the natural physical and mental limitations of the victim than merely to the victim's age. . . ." <u>Id.</u> at 35. The factor can be used when "the circumstances show that the victim, because of his age or physical or mental condition was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." <u>Id.</u> In a subsequent opinion, the supreme court further stated that "[a]lthough it is not difficult to imagine cases in which the victim's age, whether very young or very old, may seem to equate with vulnerability, we chose in <u>Adams</u> not to presume such a conclusion in any case." <u>State v. Poole</u>, 945 S.W.2d 93, 96 (Tenn. 1997). The emphasis is on vulnerability, and the "State bears the burden of proving the victim's limitations render[ed] him or her particularly vulnerable." <u>Id.</u> (quoting <u>Adams</u>, 864 S.W.2d at 35).

In determining whether the State has met its burden, the trial court should consider "whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date." <u>Id.</u> (citations omitted). Although the evidence need not be extensive, and additional weight may be given this factor in cases where a victim is extremely young or old, the State is required to prove the factor is applicable and

"there must be evidence in the record *in addition to the victim's age*." Id. at 97 (emphasis added). The court must consider all of the facts and circumstances of the offense in determining whether the particular vulnerability factor is appropriate. Id.

Here, the trial court made no findings of fact beyond its mere recitation that "enhancement factor number four is present in this case, the age of the victim." Moreover, the State offered no proof of vulnerability due to age, and this was not a case where the victim was extremely young or extremely old, which might require exceptional consideration. In sum, this factor does not apply in this case.

With regard to the fifteen mitigating factors submitted by Defendant, we find none applicable under the circumstances presented here. Regarding the first factor, alleging that Defendant's conduct neither caused nor threatened serious bodily injury, we cannot conclude that the trial court erred by refusing to mitigate Defendant's sentence on this basis. If the testimony of the victim is credible, as the trial court expressly found, we are simply unpersuaded that the threat of serious bodily injury did not exist.

The remaining fourteen mitigating factors, all submitted under "[a]ny other factor consistent with the purposes of this chapter," Tenn. Code Ann. § 40-35-113(13), are also inapplicable. A small number of the factors concern characteristics of Defendant's life, e.g., that he is employed, a father, and has friends, et cetera. We consider this type of societal behavior to be standard, and more or less expected of the average citizen. As such, it does not warrant mitigation under the circumstances presented here. See State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994) (the fact that the defendant had a fairly stable employment history and was a lifelong resident of his community did not entitle him to a reduction in his sentence). A significant number of the remaining mitigating factors are merely the antithesis of our statutory enhancement factors and sentencing considerations, e.g., no weapons were used, exceptional cruelty not found, the risk to human life was not high, the offense was not committed while defendant was on some form of release status, et cetera. As such, we find that the trial court did not err in not applying them. They also do not present circumstances proper for mitigation here.

In sum, we find that the length of Defendant's sentence was proper based solely on enhancement factor (1), which we previously agreed was deserving of great weight. Defendant is not entitled to relief on this issue.

### B. Alternative Sentencing

Defendant also contends that the trial court erred by denying him probation or any other form of alternative sentencing. We disagree.

A defendant is presumed to be a favorable candidate for alternative sentencing if, under Tennessee Code Annotated section 40-35-102(6) (1997), the defendant is an especially mitigated or standard offender of a Class C, D, or E felony and does not meet the criteria of section

40-35-102(5). This presumption of alternative sentencing may be rebutted by "evidence to the contrary," and guidance as to what constitutes such evidence may be found in Tennessee Code Annotated section 40-35-103. Under this section, a court may consider whether confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; whether it is necessary to avoid depreciating the seriousness of the offense or provide an effective deterrence to others likely to commit similar offenses; and whether measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. Tenn. Code Ann. § 40-35-103(1) (A)-(C) (1997).

Prior to imposing a sentence of confinement, the trial court acknowledged that Defendant was eligible for alternative sentencing. The trial court's finding was correct. Defendant was convicted of a Class E felony and did not meet the criteria of section 40-35-102(5). The trial court then found that the presumption in favor of alternative sentencing was overcome by evidence of Defendant's "criminal behavior as to this victim . . . ." The trial court did not make any further findings, and did not utilize the sentencing considerations set forth in Tennessee Code Annotated section 40-35-103. The trial court's findings, however brief, are nevertheless adequate under the circumstances in this case.

As previously noted, the trial court found that Defendant had a history of criminal behavior, even though it did not result in a conviction, and that it was proved by a preponderance of the evidence. We have concluded that this finding was supported by the record and applicable law. This prior criminal behavior is also an appropriate consideration in determining a defendant's specific sentence and the appropriate combination of sentencing alternatives. See Tenn. Code Ann. § 40-35-210(b)(5) (1997); State v. Ring, 56 S.W.3d 577, 582-83 (Tenn. Crim. App. 2001) (the trial court's failure to consider enhancing and mitigating factors in fashioning the appropriate combination of sentencing alternatives is "misplaced"). We further note that Defendant's denial of any wrongdoing during the sentencing hearing demonstrated a disturbing failure to take responsibility for his criminal conduct. Lack of candor and credibility are indications of a defendant's low potential for rehabilitation, State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999), which is also a factor to be considered in determining whether alternative sentencing is appropriate. Tenn. Code Ann. § 40-35-103(5) (1997); State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996).

In summation, we do not deny that there are some factors which weigh in Defendant's favor for alternative sentencing. However, after considering the circumstances of the offense, including the poor potential for rehabilitation exhibited by Defendant's repeated denials of any wrongdoing and his history of criminal behavior, we conclude that there is sufficient "evidence to the contrary" in the record to rebut Defendant's presumption of entitlement to an alternative sentence. Consequently, we find the trial court did not err in denying alternative sentencing in this case. Defendant is not entitled to relief on this issue.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE